## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| Eboni Williams, Debbie Shoemaker, Paula Mays, Tina Kovelesky, and Shadrin Herring, as representatives of a class of similarly situated persons, and on behalf of the A360, Inc. Profit Sharing Plan, formerly known as the A360, Inc. Employee Stock Ownership Plan, | Case No. 1:23-CV-03236 |
| Plaintiffs, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| Gerald Shapiro, Scott Brinkley, Argent Trust Company, A360 Holdings LLC, and John and Jane Does 1-10, | |
| Defendants. | |

## <u>NATURE OF THE ACTION</u>

1.      Plaintiffs Eboni Williams, Debbie Shoemaker, Paula Mays, Tina

Kovelesky, and Shadrin Herring ("Plaintiffs"), as representatives of the Class

described herein, and on behalf of the A360, Inc. Profit Sharing Plan, formerly

known as the A360, Inc. Employee Stock Ownership Plan (the "ESOP"), bring this

action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §

1001 et seq. ("ERISA"), against Defendants Gerald Shapiro, Scott Brinkley,

Argent Trust Company ("Argent"), A360 Holdings LLC ("A360 Holdco"), and

other persons, presently unknown, that orchestrated or benefited from the unlawful

disposition of the ESOP's assets ("Does") (all together, "Defendants"). Defendants caused the ESOP to be terminated and its "unallocated" shares to be redeemed by the company for less than fair market value. Plaintiffs bring this action to remedy Defendants' unlawful conduct and obtain compensatory and equitable relief for the ESOP and its participants.

## INTRODUCTION

2.      In 1971, Defendant Shapiro started a law firm specializing in foreclosing mortgages. He built a nationwide practice by setting up affiliated firms around the country.

3.      In parallel to his national legal practice, Shapiro built a business consulting, administration, technology, and data services enterprise to support his law firm, his mortgage-investor clients, other law firms, and other players in the real estate business.

4.      Shapiro started to separate the legal and non-legal services sides of his business in 1996. He completed additional acquisitions on the non-legal side between 2014 and 2016, primarily in the areas of consulting, software, and data solutions.

5.      In 2016, Shapiro started the process of selling the non-legal services side of his business to employees as an employee retirement benefit. On November 26, 2016, he created a new corporation, A360, Inc. ("A360"), to consolidate his

interests in his non-legal services enterprise. Effective January 1, 2017, he created the ESOP. On January 26, 2017, the ESOP acquired 100% of A360's stock (one million shares) for $30 million, or $30 per share, making the ESOP the company's sole owner. ESOPs are common exit strategies for founders due to favorable tax treatment and the ability to retain control of the company they founded.

6.      Indeed, Shapiro retained control of A360 after the sale of the company to the ESOP. He held a board seat and continued to exert practical influence over other officers and directors in the management of the company. He also tapped the legacy CEO of his non-legal services enterprise, Defendant Brinkley, to serve on A360's board. With the consolidation of Shapiro's non-legal services enterprise under A360, Brinkley became A360's CEO.

7.      The ESOP acquisition was 100% financed. The employees and the ESOP did not have $30 million in cash to buy the company. Instead, the ESOP was structured as a long-term retirement investment whereby individual employees would earn new shares each year over a period of 50 years by paying off more of the ESOP's purchase loan through retirement contributions. This is a common structure to motivate and compensate employees by giving them the immediate benefits of ownership and allowing their stakes to increase over time.

8.      In ESOP parlance, shares pending re-payment are called "unallocated" shares, and shares released to individual employees after each re-

3

payment are called "allocated" shares. In theory, ESOP participants would accumulate more allocated shares over time with their retirement plan contributions, and then sell their shares upon retirement for a nice nest egg.

9.     Employees never got to see their allocated shares accumulate over time. By September 2019, A360 had surged in value, alongside explosive growth throughout the "fintech" and "legal tech" sectors. Outside investors saw great potential in companies like A360 that provide technology solutions to the financial and legal services industries. Investors competed to acquire assets and pursue growth strategies in these sectors, and valuations rose accordingly. By the spring of 2019, Defendants Shapiro and Brinkley were aware of the hot market and obtained a valuation as high as $85 million or $85 per share. Rather than allow employees to enjoy their benefit, as owners, of the company's surge in value, Shapiro and Brinkley  teamed with outside investors (through A360 Holdco) to take the company back from the ESOP for less than it was worth. Defendant Argent, the ESOP's supposed independent trustee, authorized the seizure.

10.     ESOP participants lost out on around $35.4 million due to Defendants' scheme, which was implemented through a series of related, concurrent transactions. On September 12, 2019, the board and Argent caused participants' allocated shares (117,147 shares) to be sold to A360 Holdco based on a final valuation of around $70 per share, yielding around $8.3 million for

4

employees. The key to the scheme, however, was the next part of the deal, the redemption of the unallocated shares. Defendants caused the company to redeem the ESOP's unallocated shares (882,853 shares) for only the amount due on the purchase loan, $26.3 million or around $30 per share, even though the unallocated shares were worth the same $70 per share as the allocated shares. Defendants thus seized the company from the ESOP for total consideration of around $34.6 million, shorting the ESOP by at least $35.4 million.

11.     Defendants' seizure of the ESOP's unallocated shares for less than fair value violated ERISA. While the abbreviated life of the ESOP meant that the ESOP had a large debt to repay, which reduced the net proceeds due to employees, the ESOP owed no more than its debt. The unallocated shares needed to be valued the same as the allocated shares, and only the number of unallocated shares necessary to satisfy the debt could be re-acquired without additional consideration to the ESOP. *See Baggett v. Woodbury*, 1987 WL 383796, at *12 (N.D. Fla. Jan. 16, 1987) ("[S]tock held in an unallocated … account … is an asset of the ESOP" and may be redeemed only if "the exchange … is supported by adequate consideration."), *aff'd*, 874 F.2d 819 (11th Cir. 1989). In the redemption transaction, Defendants enlarged the company's claim to unallocated shares, exchanging $26.3 million in debt satisfaction for $61.7 million worth of stock, without additional consideration to make up the difference. This constituted an

improper "party in interest" transaction prohibited by 29 U.S.C. § 1106(a)(1)(A) & (D), and evinced lack of due care in violation of 29 U.S.C. § 1104(a)(1)(B).

12.    Defendants' actions also violated ERISA because the purpose and effect of the disposition transactions was to obtain a windfall for Defendants Shapiro and Brinkley and the A360 Holdco investor group. Through the related disposition transactions, Defendants effectively transferred $35.4 million of uncompensated ESOP share value to A360 Holdco and the company's board to hold or distribute as they pleased, as A360 Holdco and the board acceded to the control of all shares worth a total of at least $70 million after giving up only $34.6 million in the deal. And the investor group's deal with the board allowed re-issuance of shares (or other instruments) to the company's management team, including, on information and belief, Defendants Shapiro and Brinkley.[1] Defendants Shapiro and Brinkley thus annexed a portion of the company's value for themselves without consideration and shared the windfall with investors enchanted by the opportunity to acquire an appreciating asset for half its value. This course of conduct violated ERISA's prohibitions against deals to benefit

---

[1] In a since deleted public statement (a copy of which has been preserved by Plaintiffs' counsel), an investor described the deal as the "acquisition of a360 *in partnership with the company's management team.*" (emphasis added). The precise instruments through which A360 management acquired their interests in the company through the deal, and identification of the individuals who obtained an interest, have not been publicized. Based on the investor's description of the transaction and other facts known to Plaintiffs regarding management of the company before and after the deal, it is reasonable to infer that Defendants Shapiro and Brinkley received stock or other instruments of profit in connection with the deal.

fiduciaries and company insiders, 29 U.S.C. § 1106(a)(1)(D), 29 U.S.C. § 1106(b), and 29 U.S.C. § 1104(a)(1), and triggered the ESOP's right to relief against A360 Holdco as a "knowing, gratuitous transferee." *See Fish v. GreatBanc Tr. Co.*, 109 F. Supp. 3d 1037, 1043 (N.D. Ill. 2015).

13.     Plaintiffs participated in the ESOP as A360 employees. Due to Defendants' actions, Plaintiffs' proceeds of the disposition of the ESOP's stock were substantially lower than they should have been. The ESOP and its participants were due the benefit of A360's surge in value between 2017 and 2019 and now sue to recover that benefit from Defendants pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) & (3).

## JURISDICTION AND VENUE

14.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and the terms of the Plan and obtain monetary and appropriate equitable and injunctive relief.

15.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

16.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because Defendant Argent's ESOP fiduciary business is located in this district.

## PARTIES

### THE ESOP

17.     The ESOP was established effective January 1, 2017 by A360. The ESOP designated the long-time headquarters of Defendant Shapiro's businesses in Bannockburn, Illinois, as the place in which the ESOP was administered.

18.     The ESOP was an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A). The applicable sub-type of pension plan was an "individual account plan" as defined by 29 U.S.C. § 1002(34) (also known as "defined contribution plan"). The applicable sub-type of individual account plan was an "employee stock ownership plan" as defined by 29 U.S.C. § 1007(d)(6).

19.     The ESOP's participants were all common law employees of A360, which included persons directly employed by A360 and employees of controlled subsidiaries of A360 for which A360 acted on behalf of the subsidiary for purposes of providing employee benefits such as the ESOP. The ESOP had around 280 participants.

20.     A360 was thus the ESOP "employer" within the meaning of 29 U.S.C. § 1002(5). In its capacity as the ESOP employer, A360 was a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14)(C).

21.     The ESOP designated A360 as its "administrator" on Form 5500 reports signed by an A360 officer and filed with the Department of Labor from

time to time. The ESOP also designated A360 as the ESOP "administrator" in a notice regarding the termination of the ESOP distributed to participants in June 2020. A360, acting through its board or other agents directed by the board, also functioned in fact as the administrator of the ESOP and made discretionary decisions regarding the ESOP.

22.    A360 was thus the "administrator" of the ESOP within the meaning of 29 U.S.C. § 1002(16)(A). In its capacity as the ESOP administrator, A360 was a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14)(A).

23.    The ESOP's sole asset prior to its termination was one million shares of A360 stock, which it acquired on January 26, 2017. The ESOP held its one million shares of A360 stock in a qualified trust established pursuant to 26 U.S.C. § 401. Defendants disposed of the ESOP's one million shares of stock on September 12, 2019 in a series of related transactions. The board then terminated the ESOP effective September 17, 2019.

24.    Pending post-termination distribution of proceeds from the disposition transactions, the ESOP converted to a "profit-sharing" plan. A profit-sharing plan is another sub-type of individual account plan. See 29 U.S.C. § 1107(d)(3); 26 U.S.C. § 401.

25.     The ESOP started to distribute proceeds in October 2019 and
completed final distributions by December 2021. The ESOP has zero assets and no
continuing operations.

**PLAINTIFFS**

26.     Plaintiff Eboni Williams is a natural person residing in Jacksonville,
Florida. Williams was a participant in the ESOP and had allocated shares in her
account in the ESOP. Defendants sold her allocated shares to A360 Holdco, and
she received a distribution of cash proceeds from Defendants' sale of her shares. If
Defendants had complied with ERISA and provided fair value in exchange for the
ESOP's unallocated shares, additional shares and/or cash proceeds would have
been allocated to her account and distributed to her in connection with the
termination of the ESOP. Williams was therefore injured by Defendants' actions.

27.     Plaintiff Debbie Shoemaker is a natural person residing in
Jacksonville, Florida. Shoemaker was a participant in the ESOP and had allocated
shares in her account in the ESOP. Defendants sold her allocated shares to A360
Holdco, and she received a distribution of cash proceeds from Defendants' sale of
her shares. If Defendants had complied with ERISA and provided fair value in
exchange for the ESOP's unallocated shares, additional shares and/or cash
proceeds would have been allocated to her account and distributed to her in

10

connection with the termination of the ESOP. Shoemaker was therefore injured by Defendants' actions.

28.    Plaintiff Paula Mays is a natural person residing in Jacksonville, Florida. Mays was a participant in the ESOP and had allocated shares in her account in the ESOP. Defendants sold her allocated shares to A360 Holdco, and she received a distribution of cash proceeds from Defendants' sale of her shares. If Defendants had complied with ERISA and provided fair value in exchange for the ESOP's unallocated shares, additional shares and/or cash proceeds would have been allocated to her account and distributed to her in connection with the termination of the ESOP. Mays was therefore injured by Defendants' actions.

29.    Plaintiff Tina Kovelesky is a natural person residing in Boca Raton, Florida. Kovelesky was a participant in the ESOP and had allocated shares in her account in the ESOP. Defendants sold her allocated shares to A360 Holdco, and she received a distribution of cash proceeds from Defendants' sale of her shares. If Defendants had complied with ERISA and provided fair value in exchange for the ESOP's unallocated shares, additional shares and/or cash proceeds would have been allocated to her account and distributed to her in connection with the termination of the ESOP. Kovelesky was therefore injured by Defendants' actions. Kovelesky also worked as Shapiro's executive assistant and observed first-hand his control of the management of the company after the ESOP was formed.

30.     Plaintiff Shadrin Herring is a natural person residing in Jacksonville, Florida. Herring was a participant in the ESOP and had allocated shares in his account in the ESOP. Defendants sold his allocated shares to A360 Holdco, and he received a distribution of cash proceeds from Defendants' sale of his shares. If Defendants had complied with ERISA and provided fair value in exchange for the ESOP's unallocated shares, additional shares and/or cash proceeds would have been allocated to his account and distributed to him in connection with the termination of the ESOP. Herring was therefore injured by Defendants' actions.

**DEFENDANTS**

***Fiduciary Defendants***

31.     Defendant Shapiro is a natural person. On information and belief, he resides in Boca Raton, Florida. During the life of the ESOP, Shapiro was an A360 board member. As such, Shapiro acted on behalf of the company in its capacity as the ESOP administrator. In addition, in concert with other board members, Shapiro had authority to appoint and remove the ESOP trustee and direct and approve the disposition of the ESOP's assets. Shapiro also exercised functional discretion and control over the ESOP and the ESOP's assets through his continuing control of the company and his role in the sale of the company in September 2019. Upon information and belief, Shapiro knew that the company had received valuations of two to three times the value exchanged for the unallocated shares yet approved,

and helped orchestrate, the unfair redemption terms anyway because it benefited him. Shapiro also had a duty to provide, but failed to provide, complete and accurate valuation information about the company to Argent in connection with Argent's independent duty to approve the disposition of the ESOP's stock.

32.    Based on Shapiro's authority and actions with respect to the ESOP, he was a "fiduciary" of the ESOP as defined by 29 U.S.C. § 1002(21)(A)(i) & (iii).

33.    As a director of A360, Shapiro was a "party in interest" to the ESOP as defined by 29 U.S.C. § 1002(14)(H).

34.    On information and belief, Shapiro personally benefited from the company's redemption of the ESOP's unallocated shares for less than fair value, through re-issuance of shares to him personally (or to an entity in which he has beneficial ownership), or through other instruments (such as options, warrants, or executive compensation) agreed to as part of, and contingent upon, the same series of related agreements in which the board caused the company to redeem the ESOP's allocated shares.

35.    Defendant Brinkley is a natural person. On information and belief, he resides in San Antonio, Texas. During the life of the ESOP, Brinkley was an A360 board member. As such, Brinkley acted on behalf of the company in its capacity as the ESOP administrator. In addition, in concert with other board members, Brinkley had authority to appoint and remove the ESOP trustee and direct and

approve the disposition of the ESOP's assets. Brinkley also exercised functional discretion and control over the ESOP and the ESOP's assets through his role as CEO and his role in the sale of the company in September 2019. Brinkley knew that the company had received valuations of two to three times the value exchanged for the unallocated shares yet approved, and helped orchestrate, the unfair redemption terms anyway because it benefited him. Brinkley also had a duty to provide, but failed to provide, complete and accurate valuation information about the company to Argent in connection with Argent's independent duty to approve the disposition of the ESOP's stock.

36.     Based on Brinkley's authority and actions with respect to the ESOP, he was a "fiduciary" of the ESOP as defined by 29 U.S.C. § 1002(21)(A)(i) & (iii).

37.     As an officer and director of A360, he was a "party in interest" to the ESOP as defined by 29 U.S.C. § 1002(14)(H).

38.     On information and belief, Brinkley personally benefited from the company's redemption of the ESOP's unallocated shares for less than fair value, through re-issuance of shares to him personally (or to an entity in which he has beneficial ownership), or through other instruments (such as options, warrants, or executive compensation) agreed to as part of, and contingent upon, the same series of related agreements in which the board caused the company to redeem the ESOP's allocated shares.

39.     Defendant Argent is a Tennessee trust corporation headquartered in Ruston, Louisiana. Argent was appointed ESOP trustee by or with the approval of Defendants Shapiro and Brinkley, acting as A360 board members. As trustee, Argent held the assets of the ESOP and was a necessary party to any transfer of the ESOP's assets. In connection with the disposition of the ESOP's stock, Argent was required to approve the disposition terms and make a discretionary finding that the ESOP received fair market value for its stock.[2]

40.     Based on its authority and actions with respect to the ESOP, Argent was a "fiduciary" of the ESOP as defined by 29 U.S.C. § 1002(21)(A)(i).

41.     Defendants Does 1-5 are additional persons, whose identities Plaintiffs cannot confirm at this stage, who exercised any control on behalf of the ESOP with respect to the ESOP disposition transactions by providing company information to Argent or its advisors, approving the consideration to be received by the ESOP, or negotiating with other parties on behalf of the ESOP.  Such persons acted as "fiduciaries" pursuant to 29 U.S.C. § 1002(21)(A)(i).

---

[2] Argent's role in approving the disposition transactions did not limit the discretion and control exercised by A360's board in orchestrating the same transactions. Rather, the disposition transactions required approvals from both the company's board and Argent, each approval requiring discretion and control, and each equal in force and necessity to the other.

*Knowing Participant Defendants*

42.     Defendant A360 Holdco is a Delaware limited liability company.

Investors affiliated with private capital group Knox Capital Holdings LLC

established A360 Holdco in August 2019 as the vehicle through which to execute

their deal with A360's board to take over A360.[3] In connection with the ESOP

disposition transactions, A360 Holdco acquired the ESOP's allocated shares.

Through its agreement with A360's board, A360 Holdco benefited from the

company's redemption of the ESOP's unallocated shares for less than fair value,

through re-issuance of additional shares to A360 Holdco, or through cancelation of

unallocated shares and the corresponding enlargement of A360 Holdco's stake in

A360. Through its principals and agents, A360 Holdco knew that it received an

improper windfall at the expense of the ESOP through the redemption of the

unallocated shares for less than fair value.

43.     Based on its actions with respect to the ESOP disposition transactions,

A360 Holdco "knowingly participate[d]" in the disposition transactions as

contemplated by *Harris Trust v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).

44.     Defendants Does 6-10 are members of A360's management team or

other A360 investors, whose identities Plaintiffs cannot confirm at this stage, who

---

[3] Knox Capital Holdings LLC is a small group with three principals founded in December 2013. The Knox principals raise money on a deal-by-deal basis. Their co-investors in A360 include Orix Mezzanine & Private Equity and Morgan Stanley Private Credit.

received an issuance of stock or other consideration in connection with the company's redemption of the ESOP's unallocated shares for less than fair value. Such persons "knowingly participate[d]" in the disposition transactions as contemplated by *Harris Trust*.

## ERISA OVERVIEW

### 29 U.S.C. § 1106(a)

45.     ERISA prohibits transactions between a plan and a party in interest, and transactions designed to benefit a party in interest. *See* 29 U.S.C. § 1106(a)(1)(A) & (D).

46.     ERISA's prohibition on party in interest transactions is excused only if the fiduciaries and other participants to the transaction can prove that the plan received "adequate consideration" in the deal. *See* 29 U.S.C. § 1108(e)(1); *Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 935 (N.D. Ill. 1998) ("[D]efendants bear the burden of proving that the transaction [redeeming ESOP shares] was fair and of benefit to the ESOP shareholders.").

47.     "Adequate consideration" is defined as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." 29 U.S.C. § 1002(18); *see also Montgomery*, 39 F. Supp. 2d at 919 ("It must be shown that they arrived at their determination of adequate consideration in

good faith by way of a prudent investigation and the application of sound business

principles of evaluation.").

48.　　"Fair market value" is customarily considered to be "the price at

which an asset would change hands between a willing buyer and a willing seller

when the former is not under any compulsion to buy and the latter is not under any

compulsion to sell, and both parties are able, as well as willing, to trade and are

well informed about the asset and the market for such asset." *See* Proposed

Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg.

17637 (May 17, 1988).[4]

49.　　A plan employer's (*i.e.*, a party in interest's) redemption of an ESOP's

unallocated shares is a prohibited transaction and must be supported by adequate

consideration to be excused. *See Baggett*, 1987 WL 383796, at *12 ("[S]tock held

in an unallocated … account … is an asset of the ESOP" and may be redeemed

only if "the exchange … is supported by adequate consideration."); *see also See

Spires v. Schools*, 271 F. Supp. 3d 795, 811 (D.S.C. 2017) ("[C]ancellation of

shares held by the Plan and forgiveness of notes collateralized by those shares was

a transaction involving Plan assets [for purposes of 29 U.S.C. § 1106(a)].").

---

[4] Courts and practitioners customarily use this definition for guidance, although the regulation
was never enacted. *See Brundle v. Wilmington Tr.*, 919 F.3d 763, 770 (4th Cir. 2019), as
amended (Mar. 22, 2019) ("Department of Labor (DOL) has proposed, but never enacted,
regulations" defining "adequate consideration." Nonetheless, "courts look to these regulations
for guidance"); *Montgomery*, 39 F. Supp. 2d at 936–37 (citing unenacted regulation).

50.    An ESOP share redemption transaction is also a prohibited transaction if it is designed to benefit a party in interest, as such a transaction constitutes the "use" of plan assets for the benefit of a party in interest, and the "indirect … transfer" of plan assets to the party in interest. *See Carter v. San Pasqual Fiduciary Trust Co.*, 2016 WL 6803768, at *6 (C.D. Cal. Apr. 18, 2016) (company directors "caused …[the company] to redeem [the company's] stock held by the Plan" in order to sell that stock to a third party and thereby "indirectly transferred Plan assets to [themselves]" because the directors received other consideration from the third-party buyer); *Montgomery*, 39 F. Supp. 2d at 939 (company director that benefited indirectly from ESOP redemption was "clearly liable … for having failed to sell the [ESOP's] stock [back to the company] for adequate consideration.").

### 29 U.S.C. 1106(B)

51.    ERISA also demands that fiduciaries "shall not" act for their own account or otherwise act adversely to a plan. *See* 29 U.S.C. § 1106(b).

52.    Specifically, a fiduciary "shall not" "deal with the assets of the plan" for their own interest or account (§ 1106(b)(1)); "act … on behalf of a party … whose interests are adverse to the interests of the plan" in a "transaction involving the plan" (§ 1106(b)(2)); or "receive any consideration for [their] own personal account from any party" in a "transaction involving the assets of the plan" (§ 1106(b)(3)).

19

53.     Just as with 1106(a), transactions prohibited by section 1106(b) are excused only if the fiduciary and other participants to the transaction can show that the plan received adequate consideration for the ESOP shares. 29 U.S.C. § 1108(e)(1).

54.     Section 1106(b) "should be read broadly in light of Congress' concern with the welfare of plan beneficiaries." *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984). Technical separation between a fiduciary's gain and the plan do not defeat evidence of a "link" between the two. *See McMaken v. GreatBanc Tr. Co.*, 2019 WL 1468157, at *8 (N.D. Ill. Apr. 3, 2019); *see also Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Tr.*, 51 F.3d 1319, 1325 (7th Cir. 1995) (a transaction with "intent" to "prompt[] or induce[]" a transaction involving the plan is not "independent" of the plan).

55.     A company's redemption of ESOP stock in order to benefit a board member is a fiduciary self-dealing transaction in violation of section 1106(b). *See Montgomery*, 39 F. Supp. 2d at 935 ("The transaction in which [company] redeemed more than 95% of the outstanding shares involved self-dealing" where the "motive behind the transaction … was the transfer of … ownership to [company president and board member].").

**29 U.S.C. § 1104(a)(1)**

56.     A fiduciary is also liable for failing to act prudently and loyally with respect to any matter involving the fiduciary's duties to the plan. 29 U.S.C. § 1104(a)(1); *see also Brundle*, 919 F.3d at 773 ("[A]n ESOP fiduciary is liable to the plan participants if it breached its fiduciary duties, i.e., failed to act 'solely in the interest of the participants,' with the care, skill, prudence, and diligence used by a 'prudent man acting in a like capacity.'").

57.     An independent trustee is liable if its "decision-making process [is] inadequate." *Id.* at 774. In order to satisfy its duty, a trustee must consider the motivations of the parties and "investigat[e] whether [such motivations] affected the ESOP's legality under ERISA." *Id.* at 778.  A trustee must be "critical" of information supplied by company management if management has "financial incentives" in the deal. *Id.* at 775.

58.     If the acquisition of a plan's stock will benefit company insiders, the "corporate insiders with fiduciary duties to the [plan] … are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Leigh*, 727 F.2d at 124-26.

59.     ERISA's fiduciary standard also applies to actions that "influenc[e] the outcome of [an independent advisor's] valuations" of company stock. *Perez v.*

21

*Bruister*, 823 F.3d 250, 259–60 (5th Cir. 2016); *see also Howard v. Shay*, 100 F.3d 1484, 1490 (9th Cir. 1996) ("limiting the information conveyed to the expert" in order to "sway the final valuation that will set the transaction price" was a fiduciary act).

## 29 U.S.C. § 1105(a)

60.     Fiduciaries may also be liable for their actions with respect to other fiduciaries. *See* 29 U.S.C. § 1105(a). Section 1105 requires a fiduciary to attempt to "prevent or remedy the breach" of another fiduciary. *In re Amsted Indus., Inc. Litig.*, 263 F. Supp. 2d 1126, 1130 (N.D. Ill. 2003). Company insider fiduciaries may be liable for "enabling a fiduciary breach by [the ESOP trustee]" by failing to provide true valuation information to the trustee. *See Placht v. Argent Tr. Co.*, 2022 WL 3226809, at *9 (N.D. Ill. Aug. 10, 2022).

## 29 U.S.C. § 1132(a)(3)

61.     Although ERISA sections 1104–1106 do not "explicitly impos[e] a duty upon an 'other person' not to" participate in a fiduciary's violations, the Supreme Court has held that one of ERISA's remedies provisions, section 1132(a)(3), "itself imposes certain duties" upon non-fiduciaries. *See Harris Trust*, 530 U.S. at 245, 248. This is because section 1132(a) calls for "appropriate equitable relief"—relief that traditionally included "restitution" from non-fiduciaries who benefited from fiduciary misconduct with "notice of the fiduciary's

breach of duty." *Id.* at 250; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011) ("A person who obtains a benefit in breach of a fiduciary duty ... [or] in consequence of another's breach of such a duty, is liable in restitution to the person to whom the duty is owed.").

62.     Courts commonly use the phrase "knowing participation" as shorthand to describe prohibited engagement by a non-fiduciary in an ERISA violation. *See Walsh v. Vinoskey*, 19 F.4th 672, 677–78 (4th Cir. 2021). In the context of a transaction prohibited by section 1106, "to knowingly participate" is to "have knowledge" that the plan's counterparty received consideration "in excess of fair market value." *Id.*; *see also Dolins v. Cont'l Cas. Co.*, 2017 WL 3581143, at *7 (N.D. Ill. Aug. 18, 2017) (allegation that non-fiduciary "had reason to know that the [transaction] would benefit it and, by extension, [a party in interest], to the Plan beneficiaries' detriment" was "plainly enough" to state a knowing participation claim); *Fish*, 109 F. Supp. 3d at 1043 (participants may seek relief from "a knowing, gratuitous transferee" of an ESOP transaction).

63.     A claim for knowing participation in breach of section 1104 duties may also be made based on a showing that non-fiduciaries had reason to know that the price was unfair to the plan, and thus that the fiduciaries did not engage in a satisfactory review process. *See Placht*, 2022 WL 3226809, at *11 ("The [non-fiduciary defendants] have provided no logical or textual basis for distinguishing a

23

claimed violation of 29 U.S.C. § 1104 from one under 29 U.S.C. § 1106 [for purposes of a knowing participation claim.]"); *Gamino v. KPC Healthcare Holdings, Inc.*, 2021 WL 5104382, at *6 (C.D. Cal. Nov. 1, 2021) (reasonable to infer that non-fiduciaries, "given their roles and their knowledge of the value of the securities[,] … knowingly participated in [fiduciary's] ERISA § 404 breach.").

## DEFENDANTS' UNLAWFUL REDEMPTION OF UNALLOCATED SHARES

### THE DEAL

64.    All one million A360 shares owned by the ESOP initially served as collateral for the $30 million purchase note used by the ESOP to acquire the shares. The note was payable to the company over a 50-year term. The company was required to make periodic contributions to the ESOP, which the ESOP would use to pay down the purchase note.

65.    Shares were released from the collateral pledge and allocated to individual participant accounts in the ESOP in the proportion to the amount of the note paid. Shares that remained subject to the collateral pledge pending repayment (*i.e.*, unallocated shares) were legally owned by the ESOP pending allocation to individual accounts.

66.    On or around September 12, 2019, Defendants directed the disposition of all one million ESOP shares through a series of related transactions, each contingent upon, or an inducement to, the others. At that time, the ESOP held

117,147 allocated shares and 882,853 unallocated shares. The ESOP owed $26.3 million on the purchase note.

67.    First, pursuant to an agreement between Defendants Argent, A360 Holdco, and A360's directors (, the ESOP sold the 117,147 shares allocated to participants accounts to A360 Holdco for $8.3 million in cash. The valuation of the company implied by this transaction was around $70 per share.

68.    Second, pursuant to a related agreement between the same Defendants, the ESOP transferred its 882,853 unallocated shares back to the company (and thus to the company's registry in control of the board) in exchange for satisfaction of the $26.3 million remaining on the $30 million purchase note. The ESOP did not receive any cash or other consideration beyond debt satisfaction in exchange for the unallocated shares. The consideration for unallocated shares amounts to only around $30 per share.

69.    Third, A360 Holdco and its investors agreed with A360's management team, including, on information and belief, Defendants Shapiro and Brinkley, that shares or other executive compensation would be issued to management once the ESOP was terminated and its shares acquired or redeemed.

70.    After the deal, the ESOP was terminated. The only distributions to participants were the cash proceeds of the allocated shares.

71.     The first and second deal did not compensate the ESOP for the fair market value of its shares. Instead, A360 Holdco, its investors, and Defendants Shapiro and Brinkley transferred a material portion of the value of those shares to Defendants through the executive compensation and other interests that were conferred in the third deal, without any compensation for the Plan. This was also accomplished in part by undervaluing the Plan's unallocated shares.

72.     The second and third transactions constituted a fraud upon the Plan and its participants, as Defendants A360 Holdco, Shapiro, and Brinkley underreported the actual value of A360 that was being transferred in the transaction, when a significant portion of the company's value was being conferred in side deals to which the Plan was not a party.

### The Actual Value

73.     In determining the fair market value of a stock, a valuation "based on actual sales … comes as closely as may be to that fair market value, so often judicially defined as the price which property will bring when offered by a willing seller to a willing buyer, neither being obligated to buy or sell." *Elmhurst Cemetery Co. of Joliet v. Comm'r of Internal Revenue*, 300 U.S. 37, 39 (1937). For public stocks this is the market price, but the same rule applies for privately held stocks such as A360. *See Fitts' Est. v. Comm'r*, 237 F.2d 729, 731 (8th Cir. 1956) ("In determining the value of unlisted stocks, actual sales made in reasonable amounts

at arm's length, in the normal course of business, … are the best criterion of market value.").

74.   The best evidence of the value of A360's shares on September 12, 2019 is therefore the price that A360 Holdco paid in cash for the allocated shares on that same date—$70 per share. The $30 per share that the company exchanged for the unallocated shares was plainly deficient.

75.   A valuation of at least $70 per share was also consistent with a valuation revealed in a meeting of the company's executive team in 2019. Plaintiff Kovelesky attended a telephonic meeting in the spring of 2019 that was led by Defendant Brinkley and, upon information and belief, attended by Defendant Shapiro (or the substance of which he was otherwise briefed). In that meeting, Brinkley announced that the company was now worth around $85 million, or $85 per share. It was ordinary for these Defendants to have been involved in such a discussion at the time. Shapiro and Brinkley effectively ran the company, with Shapiro continuing to play an active role in management despite having sold his shares to the ESOP.

76.   The $70 per share price is also supported by marketplace trends. Because its core business provides technology-based services to real estate and mortgage companies and the lawyers they employ to enforce mortgage defaults, A360 is categorized within the investment world as a "fintech" company, which

includes companies offering "software tools that better enable traditional finance functions." Jake Jolis, *Matrix FinTech Index: 2020 Edition*, MATRIX PARTNERS, Jan. 9, 2020, *available at* https://viewpoints.matrixpartners.com/matrix-fintech-index-2019-edition-91c52dc68166 (last visited Sept. 9, 2022). Indeed, mortgage and real estate is a recognized sector within fintech. Natasha Ketabchi, *State of the Fintech Industry*, TOPTAL FINANCE, 2019, *available at* https://www.toptal.com/finance/market-research-analysts/fintech-landscape (last visited Sept. 9, 2022).

77.     The short life of the ESOP maps onto a boom period for fintech companies. Assuming a fair disposition valuation of $70 per share, A360 stock appreciated 133% between the date that the ESOP acquired the stock (January 26, 2017) and the date of the dispositions transactions (September 12, 2019). During the same period, the Matrix U.S. FinTech Index, an index of publicly traded fintech companies, increased around 180%. Jolis, *Matrix FinTech Index*. A360's growth thus broadly paralleled, and even lagged, explosive growth in the sector.

78.     Similar growth was apparent in the private equity and venture capital spheres. Although private valuations cannot be tracked with the same precision as public companies, a dramatic increase in investment activity implies competition for assets and rising valuations. A360's niche within fintech, real estate and mortgages, experienced a "tsunami" of M&A activity by the fall of 2019, when the

disposition transactions occurred. Julian Hebron, *Fintech & Real Estate Tsunami Rising Into Winter 2019-2020*, THE BASIS POINT, Sept. 3, 2019, *available at* https://thebasispoint.com/fintech-real-estate-ma-tsunami-rising-into-fall-2019/ (last visited Sept. 9, 2022). This followed a ten-fold increase in money spent by public companies to acquire private fintech companies between 2017 and 2018. *See* Dana Stadler & Allen Miller, *2019 Looks to Continue Another Lights-Out Year for Fintech Startups*, TECHCRUNCH, Dec. 31, 2018, *available at* https://techcrunch.com/2018/12/31/2019-looks-to-continue-another-lights-out-year-for-fintech-startups/ (last visited Sept. 9, 2022).

79.     The explosive growth within fintech also occurred within "legal tech," another apt category. Investor interest in legal tech companies increased by a factor of ten during the life of the ESOP. In 2016, private equity and venture capital firms invested only $225 million in legal tech companies, but by 2019 "that amount had grown almost tenfold to $2.1 billion." *Why Legal Tech is Making a Case for M&A*, 2020, FINNCAP CAVENDISH, *available at* https://www.finncapcavendish.com/blog/why-legal-tech-is-making-a-case-for-ma/ (last visited Sept. 9, 2022). Investors view potential growth in the legal tech sector as an extension of growth in the fintech sector. *See Why Legal Tech is Poised for Hypergrowth*, CRUNCHBASE NEWS, Dec. 7, 2021, *available at* https://news.crunchbase.com/startups/legaltech-hypergrowth-legalzoom-startups-

venture-raj-goyle-onit/ (last visited Sept. 9, 2022) (opining that legal tech is "similarly positioned" to fintech for growth).  It is reasonable to expect that an investor would pay substantially more for A360, at the intersection of fintech and legal tech, in September 2019 than the company was valued at in January 2017.

80.     The context of the deal also supports the conclusion that A360 rapidly appreciated in value post-ESOP and was worth at least $70 million in September 2019. ESOPs are long-term investment vehicles designed to allow employees to build equity over their working lives, not quick-exit growth strategies. Until the purchase note is paid down, ESOPs carry a substantial offset against any proceeds and are therefore not inclined to sell in the first few years after formation. However, one reason that an ESOP might sell shortly after formation is a meteoric rise in the company's value and the opportunity for a good deal, notwithstanding the debt. Likewise, a founder and former owner, such as Defendant Shapiro, would reasonably wish to have such a company back. Although ERISA requires that the ESOP enjoy the benefit of its bargain, the efforts by Defendant Shapiro to reverse course and terminate the ESOP are consistent with a steep rise in value of the company and the seller's remorse it would have likely produced.

81.     Indeed, the peak price for fintech companies during 2019, according to the Matrix U.S. FinTech Index, was June 2019, when the index was up over 200% compared to January 2017. The zenith came at the end of a sharp rise during

the first half of 2019, when fintech companies rose from merely doubling their value since the start of 2017 to tripling their value. *See* Jolis, *Matrix FinTech Index*. ESOP deals do not come together overnight. The sequence of events starting with the director Defendants (Shapiro and Brinkley) identifying their own $85 per share valuation in the spring of 2019; followed by a market spike in June of 2019; and ultimately a final price, after negotiations with the A360 Holdco investor group, of $70 per share in September of 2019 implies that Defendant Shapiro and the rest of the A360 team were motivated by market trends in the spring and summer of 2019 to attempt to re-acquire the company from the ESOP.

LACK OF PROCESS

82.     While the director Defendants and A360 Holdco had their own valuations that afforded A360 the benefit of rising valuations in the fintech and legal tech sectors, it does not appear that there was any effort to consider those valuations with respect to the ESOP's unallocated shares.

83.     Rather, it appears that Argent simply assumed that the $30 per share that the ESOP paid to acquire the shares was more than sufficient,[5] and the other Defendants allowed the unallocated share redemption transaction to proceed without correction or independent due diligence.

---

[5] An exchange based solely on purchase debt satisfaction is necessarily tied to the original purchase price, as the number of unallocated shares is reduced in proportion to any reductions in the debt balance.

84.     Indeed, Argent certified statements that the unallocated shares had a "fair value" of only $7.3 million at the time of the disposition transactions: "In exchange for the cancellation of the loan payable [of $26.3 million], the remaining 882,853 of unallocated shares with a fair value of approximately $7.3 million were returned to the Company." 2019 Form 5500, Nov. 23, 2020. But the $7.3 million value was simply the value that Argent assigned to the shares as of 2018, per the same report.[6] It does not appear that Argent made any effort to value the shares based on 2019 information.

85.     Argent's failure is especially problematic given the conflict between the $70 per share paid in the cash portion of the deal and the paltry $8.27 per share associated with the supposed "fair value" of unallocated shares redeemed by the company.[7] A trustee's role is to ensure that the ESOP receives at *least* fair value, so it was not Argent's place to stop A360 Holdco from overpaying for the allocated shares, if that is what Argent believed to be taking place. The amount that A360 Holdco was willing to pay, however, should have caused Argent to scrutinize whether it had accurate, complete, and up-to-date information to support its prior, inconsistent valuation. The fact that the company was reacquiring such a substantial number of shares—whereby the directors could re-distribute the shares

---

[6] The report specifically states that the $7.3 million figure was "certified or provided by Argent Trust Company" and that the information certified by the trustee was "completed and accurate" as of "December 31, 2019 and 2018, and for the year ended December 31, 2019."
[7] $7.3 million ÷ 882,853 unallocated shares = $8.27 per share.

however they pleased, including to themselves—also demanded scrutiny. A competent investigation would have shown that the company was worth substantially more than Argent believed, and that the other Defendants were aiming to derive a windfall from the exchange of unallocated shares for debt satisfaction. To the ESOP's detriment, Argent obliged them.

### INJURY TO PARTICIPANTS

86.    When an ESOP's unallocated shares are redeemed properly, the shares are assigned their fair value as of the redemption date, and only the number of the shares necessary to extinguish the debt revert to the company. If the total value of unallocated shares exceeds the debt balance, there will be additional shares that survive the redemption. Those shares are then allocated to participant accounts because, after the debt is extinguished, there is no need for a collateral account. If the company or another party wants to buy the surviving shares, they must pay fair value, and the proceeds are allocated to participant accounts.

87.    If Defendants had caused the ESOP's unallocated shares to be redeemed at their fair value of at least $70 per share, ESOP participants would have received additional distributions from the ESOP. At around $70 per share, the company needed to redeem less than half of the unallocated shares to extinguish the debt. The remaining shares would have been allocated *pro rata* to participant accounts. Because Defendants wanted to transfer control of all shares and close the

ESOP, an additional $35.4 million was due, and would have been paid, to the ESOP for the remaining shares, had Defendants satisfied their duties. The ESOP then would have distributed that additional $35.4 million to participants. Accordingly, participants suffered an injury due to Defendants' failure to pay adequate consideration for the unallocated shares, *i.e.* the $34.6 million that should have been, but was not, paid and distributed.

**WINDFALL TO DEFENDANTS**

88.     Participants' injuries resulted in a corresponding gain for A360 Holdco, Shapiro, Brinkley, and other persons who received a financial benefit as part of the deal. When the company redeemed the unallocated shares, the redeemed shares reverted to the custody of the company's board, where they could be canceled or re-issued. While details regarding the precise treatment of redeemed shares are not available to Plaintiffs at this stage, it is reasonable to infer that any outcome was beneficial to A360 Holdco, Shapiro, Brinkley, and others.

89.     First, any shares canceled would result in a corresponding appreciation in the value of outstanding shares. For example, if the company canceled all 882,853 shares that it redeemed, the 117,147 shares acquired by A360 Holdco would then constitute a 100% stake in the company. A360 Holdco would thus accede to 100% ownership of a company worth $70 million for which it paid $8.3 million in cash and authorized $26.3 million in debt forgiveness. In effect,

$34.6 million of unallocated share value would be transferred from the ESOP to A360 Holdco without any consideration to the ESOP. A similar, albeit smaller, transfer would occur if a smaller number of shares were canceled.

90.    Second, any shares re-issued, such as to A360 Holdco or the company's management team, or other compensation agreed to as part of the deal, would constitute a windfall to the recipients. By not paying the $34.6 million due to the ESOP, A360 Holdco and A360's management had plenty of excess value to negotiate over in their joint acquisition of the company from the ESOP. *See supra*, note 1. On information and belief, Defendants Shapiro, Brinkley, and others received stock or other consideration as part of the deal that was only made possible by, and served as an inducement to, the company's redemption of the unallocated shares for less than their fair value.

PLAINTIFFS' LACK OF KNOWLEDGE

91.    Plaintiffs did not have actual knowledge of all material facts needed to support their claims until recently. Among other things, Plaintiffs did not know the funding details (*i.e.*, the debt and collateral terms) of the ESOP; that the company re-acquired around 88% of the ESOP's stock in the termination of the ESOP using the collateral pledge; that the valuation used for the re-acquisition transaction was no more than $30 per share; that a higher valuation of re-acquired shares would have resulted in higher share allocations and distributions to ESOP

participants; that Shapiro, Brinkley, and A360 Holdco benefited from the lower

valuation used in the re-acquisition transaction; or that Argent failed to make a

competent effort to ensure that the ESOP received fair value for the re-acquired

shares. Plaintiffs lacked actual knowledge of Defendants' processes in connection

with the ESOP disposition transactions and make their allegations based upon the

investigation of counsel, their general knowledge of the company, and reasonable

inferences therefrom.

92.     In addition, while Plaintiff Kovelesky knew that Brinkley disclosed

an $85 million valuation to the company's management team in the spring of 2019,

Plaintiff Kovelesky did not work for A360 after May 2019. She did not have actual

knowledge of Defendants' preparations to sell the company, terminate the ESOP,

or redeem shares from the ESOP for less than the fair value of those shares.

## DEFENDANTS' ATTEMPTS TO ESCAPE LIABILITY BY AMENDING THE TERMINATED ESOP IN VIOLATION OF THE PLAN

93.     Having violated ERISA, the director Defendants repeatedly

attempted to amend the ESOP to prevent participants from obtaining legal relief.

94.     For the entire life of the ESOP, the terms of the Plan allowed

participants to vindicate their rights in court.

95.     Then, the director Defendants amended the Plan as a concurrent and

contingent action dependent on the successful liquidation of the ESOP's shares on

September 12, 2019. This amendment (Amendment Three), which took effect only

once the ESOP was terminated, nakedly advanced the director Defendants' self-interest in two ways.

96.    First, the amendment added an arbitration clause to the ESOP and dramatically restricted the relief available under ERISA. Amendment Three purported to prohibit a participant from obtaining any relief "on behalf of any individual or entity" other than themself—including by prohibiting relief on behalf of the ESOP authorized by 29 U.S.C. §§ 1109(a) and 1132(a)(2). The director Defendants also added a clause stating that if a participant unsuccessfully challenged the arbitration clause in court, the participant must pay "for all attorneys' fees, costs, and expenses" incurred by Defendants.

97.    Amendment Three also added a venue clause to the ESOP. The ESOP had always been administered in Bannockburn, Illinois, the long-time headquarters of Shapiro's businesses. However, the venue clause required that if a participant sued in court, that claim must be filed in the United States District Court for the Northern District of Georgia.

98.    Defendants never notified ESOP participants of Amendment Three. That Amendment Three was done in secret makes plain that it was an act of self-preservation and not a legitimate attempt to govern the Plan.

99.    Amendment Three was conditioned on the liquidation of the ESOP's shares at less than fair market value for the benefit of Shapiro and Brinkley, and

the execution of Amendment Three was likewise a condition of closing the deal. The arbitration clause of Amendment Three was a critical component of, and inducement to, the unlawful liquidation of the ESOP for the benefit of Defendants. Amendment Three therefore violated Section 13.1 of the Plan Document, which states that "no . . . amendment or termination shall be effective which shall attempt to transfer assets of the Plan to purposes other than for the exclusive benefit of Participants and their Beneficiaries." Section 13.1 of the Plan renders Amendment Three invalid.

100.    For three years after Amendment Three, the ESOP sat terminated. It had distributed all of its assets, received an IRS determination letter finalizing the termination process, and had no ongoing operations or concerns. Then, in September 2022, Plaintiffs filed this lawsuit. A month later, the long-dead ESOP was purportedly amended once again—via Amendment Four—to "clarify" Amendment Three.

101.    Amendment Four purported to soften the ESOP's arbitration clause to permit injunctive relief so long as that relief "does not include or result in the provision of additional benefits or monetary relief to any individual or entity other than" the individual plaintiff.

102.    But Amendment Three was ineffective because it violated Section 13.1 of the Plan Document. Thus, Defendants' attempt through Amendment Four

to clarify or revise the text of Amendment Three is likewise ineffective. The bar to ineffectiveness of Amendment Three—its attempt to transfer ESOP assets for a purpose other than the benefit of participants—has not been remediated. Amendment Four was a cynical attempt to salvage Amendment Three's arbitration clause in light of jurisprudence deeming nearly-identical clauses in other ESOPs invalid.

103.    As with Amendment Three, Defendants have never notified ESOP participants of Amendment Four. After this lawsuit was filed, counsel for Defendants Shapiro, Brinkley, and A360 Holdings LLC notified Plaintiffs' counsel of Amendments Three and Four.

104.    Each Plaintiff had left employment at A360 before either amendment was enacted. Each Plaintiff had no knowledge of Amendments Three or Four, and did not consent to them.

105.    The director Defendants' actions present substantial risk that they will continue to attempt to change the rules of the game post-termination in order to skirt liability for their unlawful liquidation of the ESOP. Amendments Three and Four should be declared ineffective and any future such attempts enjoined.

106.    All Defendants have attempted to enforce the invalid Amendments Three and Four against Plaintiffs.

**PLAN-WIDE RELIEF**

107.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the ESOP to bring an action individually on behalf of the ESOP to obtain for the ESOP the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the ESOP pursuant to this statutory provision.

108.    Plaintiffs seek recovery for injuries to the ESOP sustained as a result of prohibited transactions and fiduciary breaches during the statutory period and seek equitable relief on behalf of the ESOP as a whole.

109.    Plaintiffs are adequate to bring this derivative action on behalf of the ESOP, and their interests are aligned with the ESOP's participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation and intend to pursue this action vigorously on behalf of the ESOP.

**CLASS ACTION ALLEGATIONS**

110.    Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

111.    Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the ESOP defined as follows:

All participants and beneficiaries of the ESOP that would have been entitled to additional distributions under the terms of the ESOP had the

ESOP's unallocated shares been redeemed for adequate consideration, excluding any Defendant.

112.    <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The ESOP had around 280 participants.

113.    <u>Typicality</u>: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs were ESOP participants, and Plaintiffs suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiffs consistently with other Class members with regard to the ESOP. Defendants' improper actions affected all ESOP participants similarly.

114.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

115.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.    Whether Argent was a fiduciary with respect to the ESOP;

    b.    Whether the director Defendants were fiduciaries with respect to the ESOP;

c.   Whether the ESOP's fiduciaries failed to comply with the
fiduciary standards of prudence and loyalty;

d.   Whether the company was obligated to provide adequate
consideration for the redemption of the ESOP's unallocated
shares;

e.   Whether the company provided adequate consideration for the
redemption of the ESOP's unallocated shares;

f.   Whether the company, Defendant Shapiro, and Defendant
Brinkley were parties in interest to the ESOP;

g.   Whether the company's redemption of the ESOP's unallocated
shares constituted a prohibited transaction;

h.   Whether Defendants Shapiro and Brinkley profited from
Defendants' violations of ERISA;

i.   Whether Defendant A360 Holdco knowingly benefited from one
or more violations of ERISA;

j.   The proper form of equitable and injunctive relief; and

k.   The proper measure of monetary relief.

116.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A)
because prosecuting separate actions against Defendants would create a risk of

inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

117.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as disgorgement of proceeds of the prohibited transactions and allocation of the proceeds to participants, would be dispositive of the interests of all participants.

118.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will

not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

119.    Plaintiffs and their undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## COUNT I

### 29 U.S.C. § 1106(A)
CAUSING PROHIBITED TRANSACTIONS BETWEEN THE PLAN AND PARTIES IN INTEREST DEFENDANTS SHAPIRO, BRINKLEY, ARGENT, AND DOES 1–5

120.    Plaintiffs incorporate by reference the allegations contained in paragraphs 17-25, 31-41, and 64-90 of this Amended Complaint.

121.    The redemption of the ESOP's unallocated shares by the company, and to benefit Defendants Shapiro and Brinkley, constituted prohibited transactions in violation of 29 U.S.C. § 1106(a)(1)(A) & (D).

122.    Defendants Shapiro, Brinkley, Argent, and Does 1–5 caused the prohibited transaction in their capacities as the ESOP fiduciaries responsible for approving the consideration to be provided to the ESOP in exchange for the ESOP's unallocated shares.

123.    The circumstances around the redemption transaction show that the consideration provided for the unallocated shares was inadequate and that, had the

ESOP received adequate consideration, Plaintiffs and other participants would have received additional allocations.

124.    ERISA, 29 U.S.C. § 1109(a), provides that any person that is a fiduciary with respect to a plan and that breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

125.    ERISA Section 1132(a) permits a plan participant to bring a suit for relief under Section 1109 and to obtain appropriate equitable relief to enforce the provisions of ERISA.

126.    Defendants Shapiro, Brinkley, Argent, and Does 1–5 caused losses to the ESOP resulting from the above-mentioned prohibited transactions and are liable to the ESOP for those losses. Defendants Shapiro and Brinkley profited from the above-mentioned prohibited transactions and are liable to the ESOP for their profits. Defendants are also liable for appropriate equitable relief to be determined by the Court.

## COUNT II

### 29 U.S.C. § 1106(B)
### PROHIBITED TRANSACTIONS BETWEEN THE PLAN AND A FIDUCIARY
### DEFENDANTS SHAPIRO AND BRINKLEY

127.    Plaintiffs incorporate by reference the allegations contained in paragraphs 17-25, 31-38, and 64-81, and 86-90 of this Amended Complaint.

128.    Defendants Shapiro and Brinkley, while serving as fiduciaries of the ESOP, dealt with ESOP assets for their own benefit in violation of 29 U.S.C. § 1106(b)(1); acted on behalf of interests adverse to the ESOP (the acquisition team made up of A360 management and A360 Holdco) in transactions involving the ESOP in violation of 29 U.S.C. § 1106(b)(2); and received consideration from a transaction involving the assets of the ESOP in violation of 29 U.S.C. § 1106(b)(3), by approving the redemption of unallocated shares for less than fair market value and receiving consideration that was contingent upon, an inducement to, or otherwise made possible through that redemption.

129.    The circumstances around the redemption transaction show that the consideration provided for the unallocated shares was inadequate and that, had the ESOP received adequate consideration, Plaintiffs and other participants would have received additional allocations.

130.    ERISA, 29 U.S.C. § 1109(a), provides that any person that is a fiduciary with respect to a plan and that breaches any of the responsibilities,

obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

131.    ERISA Section 1132(a) permits a plan participant to bring a suit for relief under Section 1109 and to obtain appropriate equitable relief to enforce the provisions of ERISA.

132.    Defendants Shapiro and Brinkley caused losses to the ESOP resulting from the above-mentioned prohibited transactions and are liable to the ESOP for those losses. Defendants Shapiro and Brinkley also profited from the above-mentioned prohibited transactions and are liable to the ESOP for their profits. Defendants are also liable for appropriate equitable relief to be determined by the Court.

## COUNT III

### 29 U.S.C. § 1104(A)(1)
### BREACH OF THE FIDUCIARY DUTIES OF PRUDENCE AND LOYALTY
### DEFENDANTS SHAPIRO, BRINKLEY, ARGENT, AND DOES 1–5

133.    Plaintiffs incorporate by reference the allegations contained in paragraphs 17-25, 31-41, and 64-90 of this Amended Complaint.

134.    Defendants Shapiro, Brinkley, Argent, and Does 1–5 failed to conduct a prudent investigation of the value of the ESOP's unallocated stock in

order to obtain a fair and reasonable redemption price on behalf of ESOP participants. Defendants failed to act solely in the interest of ESOP participants in the process of negotiating and approving the redemption consideration to be paid for the ESOP's unallocated shares. Instead, Defendants Shapiro and Brinkley aimed to circumscribe the valuation process to prevent the unallocated shares from being valued based on accurate, complete, and up-to-date information, and Argent imprudently obliged them. Defendants therefore failed to comply with the fiduciary standard of care and their duty of loyalty pursuant to 29 U.S.C. § 1104(a)(1).

135.    The circumstances around the redemption of unallocated shares show that had the fiduciaries conducted the process of valuing and redeeming the unallocated shares in a diligent and careful manner solely in the interest of participants, they would have determined that the unallocated shares had a fair market value of at least $70 per share. Had Defendants performed their fiduciary duties in this prudent and loyal manner, Plaintiffs and other participants would have received additional benefits.

136.    ERISA, 29 U.S.C. § 1109(a), provides that any person that is a fiduciary with respect to a plan and that breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and

additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

137.    ERISA Section 1132(a) permits a plan participant to bring a suit for relief under Section 1109 and to obtain appropriate equitable relief to enforce the provisions of ERISA.

138.    Defendants Shapiro, Brinkley, Argent, and Does 1–5 caused losses to the Plan resulting from the above-mentioned breaches of the duties of prudence and loyalty and are liable to the Plan for those losses. Defendants Shapiro and Brinkley profited from the above-mentioned fiduciary breaches and are liable to the ESOP for their profits. Defendants are also liable for appropriate equitable relief to be determined by the Court.

<u>**COUNT IV**</u>

**29 U.S.C. § 1105(A)**
**CO-FIDUCIARY LIABILITY**
**DEFENDANTS SHAPIRO, BRINKLEY, AND ARGENT**

139.    Plaintiffs incorporate by reference the allegations contained in paragraphs 17-25, 31-40, and 64-90 of this Amended Complaint .

140.    Defendants Shapiro and Brinkley knew that Argent failed to conduct a prudent, independent investigation of the value of the ESOP's unallocated shares. Indeed, Defendants Shapiro and Brinkley knew that the company had been valued at $85 million just months before, yet failed to share that information with Argent.

Further, the director Defendants approved below-market consideration for the unallocated shares, notwithstanding the ESOP trustee's failure to discharge its fiduciary duty. Indeed, the below-market redemption was what the director Defendants desired. The director Defendants are therefore liable pursuant to 29 U.S.C. § 1105(a) for knowingly participating in Argent's breach, for enabling Argent's breach through their disloyalty, and for failing to remedy Argent's breach.

141.    Defendant Argent should have discovered the self-serving actions of Defendants Shapiro and Brinkley if it had discharged its duties with due care. By failing to take any action to prevent Defendants Shapiro and Brinkley from improperly and disloyally profiting at the expense of the ESOP, Argent either enabled those violations through its own imprudence, or failed to remedy a known breach, in violation of 29 U.S.C. § 1105(a).

142.    The circumstances around the redemption transaction show that the consideration provided for the unallocated shares was inadequate and that, had the ESOP received adequate consideration, Plaintiffs and other participants would have received additional allocations.

143.    ERISA, 29 U.S.C. § 1109(a), provides that any person that is a fiduciary with respect to a plan and that breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to

make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

144.    ERISA § 1132(a) permits a plan participant to bring a suit for relief under Section 1109 and to obtain appropriate equitable relief to enforce the provisions of ERISA.

145.    Defendants Shapiro, Brinkley, and Argent are jointly liable for their failures as co-fiduciaries for losses to the Plan resulting from the above-mentioned violations of ERISA and are liable to the Plan for those losses. Defendants Shapiro and Brinkley profited from the above-mentioned co-fiduciary breaches and are liable to the ESOP for their profits. Defendants are also liable for appropriate equitable relief to be determined by the Court.

## COUNT V

### 29 U.S.C. § 1132(A)(3)
### KNOWING PARTICIPATION IN A PROHIBITED TRANSACTION
### DEFENDANTS A360 HOLDCO AND DOES 6–10

146.    Plaintiffs incorporate by reference the allegations contained in paragraphs 17-25, 42-44, 64-90 of this Amended Complaint.

147.    Pursuant to 29 U.S.C. § 1132(a)(3), a participant may seek "appropriate equitable relief [] to redress [ERISA] violations[.]" The Supreme Court has held that such "appropriate equitable relief" includes recovering

proceeds of a prohibited transaction from a knowing participant in the transaction. *See Harris Trust*, 530 U.S. at 238.

148.    Defendants A360 Holdco and Does 6–10 had knowledge of the circumstances that rendered the company's redemption of the ESOP's unallocated shares for less than fair value a violation of section 1106(a), and of the circumstances the rendered Shapiro's and Brinkley's participation in the deal as fiduciaries a violation of section 1106(b). A360 Holdco knew that the company was worth at least $70 million and that giving up only around half that amount to acquire the company in partnership with A360's management would result in a windfall for A360 Holdco and company management. A360 Holdco also knew that Defendants Shapiro and Brinkley exercised effective control of the ESOP disposition process (from working alongside them to carry out the deal), that the company redeemed the unallocated shares, and that Argent had a fiduciary role to play with respect to approving the consideration to be exchanged with the ESOP. As members of A360's management team that also benefited from the deal, Does 6-10 also worked alongside A360 Holdco and had similar knowledge.

149.    A360 Holdco in fact received a windfall due to the above-mentioned prohibited transaction violations when the deal closed, through automatic appreciation of its shares by cancelation of the company-redeemed shares, or by re-issuance of company-redeemed shares, all agreed to as part of the same series of

related transactions in which the company redeemed the unallocated shares. Does 6–10 similarly benefited.

150.    Defendant A360 Holdco therefore holds proceeds of the prohibited transaction violations: its A360 shares. Does 6-10 similarly hold proceeds that, after an opportunity for discovery, Plaintiffs will be able to trace to their windfall.

151.    Pursuant to principles of equity, as adopted and applied by federal courts in ERISA cases, Defendants A360 Holdco and Does 6-10 are liable to the ESOP for undue proceeds of the redemption of the ESOP's unallocated stock for less than fair value.

## COUNT VI

### 29 U.S.C. § 1132(A)(3)
### KNOWING PARTICIPATION IN BREACHES OF THE DUTIES OF PRUDENCE AND LOYALTY
### DEFENDANTS A360 HOLDCO AND DOES 6–10

152.    Plaintiffs incorporate by reference the allegations contained in paragraphs 17-25, 42-44, 64-90 of this Amended Complaint.

153.    Pursuant to 29 U.S.C. § 1132(a)(3), a participant may seek "appropriate equitable relief [] to redress [ERISA] violations[.]" Such "appropriate equitable relief" includes recovering proceeds of a fiduciary breach from a knowing participant in the breach. *See Harris Trust*, 530 U.S. at 238; *Placht*, 2022 WL 3226809, at *11.

154.    Defendants A360 Holdco and Does 6–10 had knowledge of the circumstances that rendered the company's redemption of the ESOP's unallocated shares for less than fair value a violation of section 1104(a)(1)(B), and of the circumstances the rendered Shapiro and Brinkley's participation in the deal as fiduciaries a violation of section 1104(a)(1)(A). A360 Holdco knew that the company was worth at least $70 million and that giving up only around half that amount to acquire the company in partnership with A360's management would result in a windfall for A360 Holdco and company management. A360 Holdco knew (from working alongside them to carry out the deal) that Defendants Shapiro and Brinkley circumscribed the valuation process to prevent an accurate, complete, and up-to-date valuation. A360 Holdco also knew that Argent had a fiduciary role to the play with respect to approving the consideration to be exchanged with the ESOP, and that Argent failed to complete the necessary accurate, complete, and up-to-date valuation. As members of A360's management team that also benefited from the deal, Does 6-10 also worked alongside A360 Holdco and had similar knowledge.

155.    A360 Holdco in fact received a windfall due to the above-mentioned fiduciary breaches when the deal closed, through automatic appreciation of its shares by cancelation of the company-redeemed shares, or by re-issuance of company-redeemed shares, all agreed to as part of the same series of related

transactions in which the company redeemed the unallocated shares. Does 6–10 similarly benefited.

156.    Defendant A360 Holdco therefore holds proceeds of Defendants' violations of loyalty and due care: its A360 shares. Does 6-10 similarly hold proceeds that, after an opportunity for discovery, Plaintiffs will be able to trace to their windfall.

157.    Pursuant to principles of equity, as adopted and applied by federal courts in ERISA cases, Defendants A360 Holdco and Does 6–10 are liable to the ESOP for undue proceeds of the ESOP fiduciaries' disloyal and imprudent conduct.

## COUNT VII

### 29 U.S.C. § 1132(A)(3)(A)
### ACTS AND PRACTICES IN VIOLATION OF THE TERMS OF THE PLAN
### ALL DEFENDANTS

158.    Plaintiffs incorporate by reference the allegations contained in paragraphs 17-25, 31-40, 64-90, and 93-106 of this Amended Complaint.

159.    Defendants violated Section 13.1 of the Plan Document by (1) purporting to amend the Plan Document in an attempt to transfer ESOP assets for a purpose other than the benefit of ESOP participants and (2) attempting to enforce the invalid amendments.

160.     Defendants should be enjoined, pursuant to 29 U.S.C.

§ 1132(a)(3)(A), from attempting to enforce the invalid amendments to the Plan

Document and from executing further invalid amendments in violation of Section

13.1 of the Plan Document.

161.     The Plan Document should be reformed to omit Amendments Three

and Four, which violated Section 13.1 of the Plan Document and thus were

ineffective.

162.     Because the purchase agreement outlining the terms of the sale of the

ESOP's shares was contingent upon and effective with the adoption of Amendment

Three, the purchase agreement through which the ESOP's shares were sold should

be rescinded.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment against Defendants and for the

following relief:

A.     Certify Plaintiffs' authority to seek plan-wide relief on behalf of the
ESOP pursuant to 29 U.S.C. § 1132(a)(2);

B.     Alternatively, certify this action as a class action pursuant to Fed. R.
Civ. P. 23, certify the named Plaintiffs as class representatives, and
their counsel as class counsel;

C.     Declare that the director Defendants, Argent, and Does 1–5 caused the
ESOP to engage in one or more prohibited transactions in violation of
29 U.S.C. § 1106(a)(1)(A) & (D);

D.     Declare that Defendants Shapiro and Brinkley engaged in prohibited
transactions in violation of 29 U.S.C. § 1106(b)(1)–(3);

E.    Declare that these prohibited transactions did not satisfy all requirements for any prohibited transaction exemption under ERISA;

F.    Declare that the director Defendants, Argent, and Does 1–5 failed to satisfy their duties of prudence and loyalty pursuant to 29 U.S.C. § 1104(a)(1), and that the director Defendants and Argent violated their duties as co-fiduciaries pursuant to 29 U.S.C. § 1105(a);

G.    Declare that Defendant A360 Holdco knowingly participated in the other Defendants' prohibited transactions and other fiduciary breaches in violation of ERISA;

H.    Allow sufficient discovery to identify all Doe Defendants, and allow necessary amendments to the Complaint;

I.    Order the director Defendants, Argent, and Does 1–5 to make good to the ESOP all losses resulting from their violations of ERISA;

J.    Order Defendants Shapiro and Brinkley to disgorge their profits from their violations of ERISA;

K.    Impose a constructive trust and/or equitable lien on, and an accounting of, all proceeds of the prohibited transactions and fiduciary breaches that are under the control of Defendants A360 Holdco and Does 6–10;

L.    Order that Defendants provide other appropriate equitable relief to the ESOP and its participants and beneficiaries, including but not limited to rescission of the amendments terminating the Plan and the purchase agreement that was contingent upon and effective with the terminating amendments, or reformation of the Plan and purchase agreement such that the executive compensation and interests conveyed to Defendants Shapiro and Brinkley that were intended to represent a material portion of the value of the ESOP's shares be transferred to the Plan and distributed to participant accounts, as appropriate;

M.    Approve a fair and equitable plan of allocation of any proceeds recovered on behalf of the ESOP;

N.    Appoint an independent trustee of the ESOP to oversee the allocation of proceeds recovered on behalf of the ESOP consistent with the

terms of the ESOP and ERISA and order the costs of such independent trustee to be paid for by Defendants;

O.      Remove Defendants Shapiro and Brinkley from any fiduciary positions with respect to the ESOP;

P.      Declare that Amendment Three and Amendment Four to the ESOP's Plan Document were ineffective under Section 13.1 of the Plan Document and enjoin Defendants' attempts to enforce them;

Q.      Order that the ESOP may not be further amended without the Court's approval;

R.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

S.      Award prejudgment and post-judgment interest; and

T.      Award such other and further relief as the Court deems just and equitable.

Dated: August 18, 2023          **ENGSTROM LEE LLC**
                                /s/ Mark E. Thomson
                                Mark E. Thomson, MN No. 0398260*
                                Jennifer K. Lee, MN No. 0399012*
                                Carl F. Engstrom, MN No. 0396298*
                                729 N. Washington Ave., Suite 600
                                Minneapolis, MN 55401
                                Telephone: (612) 305-8349
                                mthomson@engstromlee.com
                                jlee@engstromlee.com
                                cengstrom@engstromlee.com

                                **MORGAN & MORGAN, PA**
                                Marc Edelman, FL Bar No. 96342**
                                201 N. Franklin Street, 7th Floor
                                Tampa, FL 33602
                                Telephone: (813) 223-5505
                                medelman@forthepeople.com

**WENZEL, FENTON, CABASSA, P.A.**
Brandon J. Hill, FL No. 0037061**
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
Main Number: 813-224-0431
bhill@wfclaw.com

**JONES GRANGER**
Harry B. Bailey, III, GA No. 032105
1201 Peachtree Street NE, Suite 300
Atlanta, GA 30361
Telephone: (404) 870-9020
hbai@jonesgranger.com

*Admitted *Pro Hac Vice*
***Pro Hac Vice* Forthcoming

**ATTORNEYS FOR PLAINTIFFS**