## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| EBONI WILLIAMS, DEBBIE SHOEMAKER, PAULA MAYS, TINA KOVELESKY, and SHADRIN HERRING, as representatives of a class of similarly situated persons, and on behalf of the A360, Inc. Profit Sharing Plan, formerly known as the A360, Inc. Employee Stock Ownership Plan,<br><br>     Plaintiffs,<br><br>v.<br><br>GERALD SHAPIRO, SCOTT BRINKLEY, ARGENT TRUST COMPANY, A360 HOLDINGS LLC, and John and Jane Does 1-10,<br><br>     Defendants. | Civil Action No. 1:23-cv-03236-VMC |

### OPINION AND ORDER

This is a putative class action under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"). Before the Court is a Motion to Compel Arbitration (Docs. 44) filed by Defendants on August 4, 2023 and renewed on September 15, 2023 ("Motion," Doc. 78).[1] For the reasons below, the Court denies the Motion.

---

[1] Defendants also filed a Motion for Oral Argument (Doc. 85).

## Background[2]

### I.    Factual Background

On November 26, 2016, Defendant Gerald Shapiro created A360, Inc. ("A360"). (Doc. 69 ¶ 5). Mr. Shapiro later created the A360, Inc. Employee Stock Ownership Plan (the "ESOP") effective January 1, 2017. (*Id.* ¶¶ 1, 5). Plaintiffs were A360 employees and participants in the ESOP. (*Id.* ¶¶ 13, 26–30).

On January 26, 2017, the ESOP acquired 100% of A360's stock (one million shares) for $30 million, or $30 per share, making the ESOP the company's sole owner. (*Id.* ¶ 5). Mr. Shapiro retained control of A360 after the sale of the company to the ESOP. (*Id.* ¶ 6). He held a board seat and continued to exert practical

---

[2] The Eleventh Circuit "treat[s] motions to compel arbitration similarly to motions for summary judgment." *Hearn v. Comcast Cable Commc'ns, LLC*, 992 F.3d 1209, 1215 (11th Cir. 2021) (citing *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) ("We agree with our sister circuits that a summary judgment-like standard is appropriate and hold that a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement.")). Therefore, the Court "view[s] the facts in the light most favorable to . . . the nonmovant." *Id.* (citing *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)). However, as other circuit courts have observed, while "a plaintiff generally cannot rely on allegations in its complaint to defeat a well-supported motion for summary judgment, Fed. R. Civ. P. 56(e), the non-moving party's burden 'to offer evidence supporting its own case' does not arise 'unless the moving party meets its initial burden' of production." *Air-Con, Inc. v. Daikin Applied Latin Am.*, LLC, 21 F.4th 168, 177 (1st Cir. 2021) (quoting *Carmona v. Toledo*, 215 F.3d 124, 133 (1st Cir. 2000)). Accordingly, at this early stage in the proceedings, the Court may take as true allegations in the complaint uncontroverted by other evidence. *See id.* (citing *Garcia v. De Batista*, 642 F.2d 11, 14 (1st Cir. 1981)).

influence over other officers and directors in the management of the company. (*Id.*). Mr. Shapiro tapped Defendant Scott Brinkley to serve on A360's board, and Brinkley became A360's CEO. (*Id.*).

The ESOP acquisition was 100% financed. (*Id.* ¶ 7). The employees and the ESOP did not have $30 million in cash to buy the company. (*Id.*). Instead, the ESOP was structured as a long-term retirement investment in which individual employees would earn new shares each year over 50 years by paying off more of the ESOP's purchase loan through retirement contributions. (*Id.*).

The parties refer to shares pending re-payment as "unallocated" shares, and shares released to individual employees after each re-payment as "allocated" shares. (*Id.* ¶ 8). In theory, ESOP participants would accumulate more allocated shares over time with their retirement plan contributions, and then sell their shares upon retirement for a nice nest egg. (*Id.*).

Plaintiffs allege that Defendants Shapiro and Brinkley were aware of a "hot market" for "fintech" and "legal tech" companies such as A360, and obtained a valuation as high as $85 million or $85 per share. (*Id.* ¶ 9). Rather than allow employees to enjoy their benefit, as owners, of the company's surge in value, they allege that Defendants Shapiro and Brinkley teamed with outside investors (through Defendant A360 Holdings LLC ("A360 Holdco")) to take the company back from the ESOP for less than it was worth. (*Id.*). Defendant Argent Trust

Company ("Argent"), the ESOP's independent trustee, authorized the transaction. (*Id.*).

Plaintiffs contend that ESOP participants lost out on around $35.4 million because of Defendants' scheme, which was implemented through a series of related, concurrent transactions. (*Id.* ¶ 10). On September 12, 2019, the board and Argent caused participants' allocated shares (117,147 shares) to be sold to A360 Holdco based on a final valuation of around $70 per share, yielding around $8.3 million for employees. (*Id.*). At the same time, Defendants caused the company to redeem the ESOP's unallocated shares (882,853 shares) for only the amount due on the purchase loan, $26.3 million or around $30 per share, even though the unallocated shares were worth the same $70 per share as the allocated shares. (*Id.*). Plaintiffs thus allege that Defendants seized the company from the ESOP for total consideration of around $34.6 million, shorting the ESOP by at least $35.4 million. (*Id.*). The board then terminated the ESOP effective September 17, 2019. (*Id.* ¶ 23). The ESOP started to distribute proceeds in October 2019 and completed final distributions by December 2021. (*Id.* ¶ 25). The ESOP has zero assets and no continuing operations. (*Id.*).

## II.   The Plan

The ESOP was an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A). (*Id.* ¶ 18). The applicable sub-type of pension plan was an

"individual account plan" as defined by 29 U.S.C. § 1002(34) (also known as "defined contribution plan"). (*Id.*). The applicable sub-type of individual account plan was an "employee stock ownership plan" as defined by 29 U.S.C. § 1107(d)(6). (*Id.*).

The ESOP's sole asset before its termination was one million shares of A360 stock, which it acquired on January 26, 2017. (*Id.* ¶ 23). The ESOP held its one million shares of A360 stock in a qualified trust established pursuant to 26 U.S.C. § 401. (*Id.* ¶ 23). As noted above, Defendants disposed of the ESOP's one million shares of stock on September 12, 2019 in a series of related transactions, and the board then terminated the ESOP effective September 17, 2019.

### A. Participants and Fiduciaries

The ESOP designated A360 as its "administrator" on Form 5500 reports signed by an A360 officer and filed with the Department of Labor from time to time. (*Id.* ¶ 21). The ESOP also designated A360 as the ESOP "administrator" in a notice regarding the termination of the ESOP distributed to participants in June 2020. (*Id.*). A360, acting through its board or other agents directed by the board, also functioned in fact as the administrator of the ESOP and made discretionary decisions about the ESOP. (*Id.*). A360 was thus the "administrator" of the ESOP within the meaning of 29 U.S.C. § 1002(16)(A). (*Id.* ¶ 22). In its capacity as the ESOP

5

administrator, A360 was a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14)(A). (*Id.*).

The ESOP's participants were all common law employees of A360, which included persons directly employed by A360 and employees of controlled subsidiaries of A360 for which A360 acted on behalf of the subsidiary to provide employee benefits such as the ESOP. (*Id.* ¶ 19). The ESOP had around 280 participants. (*Id.*). A360 was thus the ESOP "employer" within the meaning of 29 U.S.C. § 1002(5). (*Id.* ¶ 20). In its capacity as the ESOP employer, A360 was a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14)(C). (*Id.*).

Based on Shapiro's authority and actions with respect to the ESOP, he was a "fiduciary" of the ESOP as defined by 29 U.S.C. § 1002(21)(A)(i) & (iii). (*Id.* ¶ 32). And, as a director of A360, Shapiro was a "party in interest" to the ESOP as defined by 29 U.S.C. § 1002(14)(H). (*Id.* ¶ 33). Similarly, based on Brinkley's authority and actions with respect to the ESOP, he was a "fiduciary" of the ESOP as defined by 29 U.S.C. § 1002(21)(A)(i) & (iii). (*Id.* ¶ 36). As an officer and director of A360, he was a "party in interest" to the ESOP as defined by 29 U.S.C. § 1002(14)(H). (*Id.* ¶ 37).

As trustee, Argent held the assets of the ESOP and was a necessary party to any transfer of the ESOP's assets. (*Id.* ¶ 39). In connection with the disposition of the ESOP's stock, Argent was required to approve the disposition terms and make

a discretionary finding that the ESOP received fair market value for its stock. (*Id.*).

Based on its authority and actions with respect to the ESOP, Argent was a

"fiduciary" of the ESOP as defined by 29 U.S.C. § 1002(21)(A)(i). (*Id.* ¶ 30).

### B.    Relevant Provisions

Aside from a provision regarding administrative appeals from denials of

claims, the original ESOP Plan did not provide for any restrictions on litigation or

venue for ERISA actions arising under the Plan. (Jan. 1, 2017 Plan at 38–39, Doc.

44-1 Ex. 1). For amendments to the Plan, it provided:

> 13.1 Future of Plan. While it is the intention of the
> Company to continue the Plan indefinitely, the Company
> shall have the right to terminate the Plan at any time. The
> Plan may be amended at any time and from time to time
> by action of the Board of Directors or any person or
> persons to whom the Board of Directors may specify in
> writing; provided, however, that no such amendment or
> termination shall be effective which shall attempt to
> transfer assets of the Plan to purposes other than for the
> exclusive benefit of Participants and their Beneficiaries,
> or which shall cause or permit any assets of the Plan to
> revert to or become the property of the Company prior
> to the satisfaction of all liabilities of the Plan.

(*Id.* at 40).

In connection with the September 2019 transaction, the director Defendants

amended the Plan as a concurrent and contingent action dependent on the closing

of the transaction to liquidate the ESOP's shares on September 12, 2019 ("Third

Amendment"). (Doc. 69 ¶ 95). Most relevant to the current Motion, the

amendment added an arbitration clause to the ESOP. (*Id.* ¶ 96). The Third

Amendment also purported to prohibit a participant from obtaining any relief "on

behalf of any individual or entity" other than himself. (*Id.*). Specifically, it

provided:

> <u>No Group, Class, or Representative Arbitrations</u>. All
> Covered Claims must be brought solely in the Claimant's
> individual capacity and not in a representative capacity
> or on a class, collective, or group basis. Each arbitration
> shall be limited solely to one Claimant's Covered Claims,
> and that Claimant may not seek or receive any remedy
> which has the purpose or effect of providing additional
> benefits or monetary or other relief to any individual or
> entity other than the Claimant. For instance, with respect
> to any claim brought under ERISA § 502(a)(2) to seek
> appropriate relief under ERISA § 409, the Claimant's
> remedy, if any, shall be limited to (i) the alleged losses to
> the Claimant's individual Account resulting from the
> alleged breach of fiduciary duty, (ii) a pro-rated portion
> of any profits allegedly made by a fiduciary through the
> use of Plan assets where such pro-rated amount is
> intended to provide a remedy solely to Claimant's
> individual Account, and/or (iii) such other remedial or
> equitable relief as the arbitrator(s) deem(s) proper so
> long as such remedial or equitable relief does not include
> or result in the provision of additional benefits or
> monetary relief to any individual or entity other than the
> Claimant, and is not binding on the Committee or
> Trustee with respect to any individual or entity other
> than the Claimant. The requirement that (x) all Covered
> Claims be brought solely in a Claimant's individual
> capacity and not in a purported group, class, collective,
> or representative capacity, and (y) that no Claimant shall
> be entitled to receive, and no Claimant shall be awarded,
> any relief other than individual relief, shall govern
> irrespective of any AAA rule or decision to the contrary
> and is a material and non-severable term of this Section

> 19.1. The arbitrator(s) shall consequently have no jurisdiction or authority to compel or permit any class, collective, or representative action in arbitration, to consolidate different arbitration proceedings, or to join any other party to any arbitration. Any dispute or issue as to the applicability or validity of this Section 19.1(b) (the "Class Action Waiver") shall be determined by a court of competent jurisdiction. . . .

(3d. Plan Am. at 5, Doc. 44-1 Ex. 4). The amendment defined "Covered Claims" as follows:

> (a) Covered Claims. Any claim made by or on behalf of a current or former Employee, a current or former Participant or current or former Beneficiary or by or on behalf of the Plan, the Trust or under the Trust Agreement (a "Claimant") which arises out of, relates to, or concerns this Plan, the Trust Agreement, or the Trust, including without limitation, any claim for benefits under the Plan, Trust Agreement, or Trust; any claim asserting a breach of, or failure to follow, the terms of the Plan or Trust Agreement or Trust; and any claim asserting a breach of, or failure to follow, any provision of ERISA or the Code, including without limitation claims for breach of fiduciary duty, ERISA § 510 claims, and claims for failure to timely provide notices or information required by ERISA or the Code (collectively, "Covered Claims"),] . . . .

(*Id.* at 5). The provision required that the proceedings remain confidential: "Neither the Claimant nor the arbitrator(s) may disclose the existence, content, subject matter, or results of any arbitration without the prior written consent of the Company." (*Id.* at 7). Finally, the provision stated that "[i]n the event a court of competent jurisdiction were to find these requirements to be unenforceable or

invalid, then the entire Arbitration Procedure (i.e., all of this Section 19) shall be rendered null and void in all respects," (*Id.* at 5–6), and also provided that if a participant unsuccessfully challenged the arbitration clause in court, the participant must pay "for all attorneys' fees, costs, and expenses" incurred by Defendants. (Doc. 69 ¶ 96).

For three years after the Third Amendment, the ESOP sat terminated. (*Id.* ¶ 100). It had distributed all its assets, received an IRS determination letter finalizing the termination process, and had no ongoing operations or concerns. (*Id.*). Then, in September 2022, Plaintiffs filed this lawsuit. (*Id.*). A month later, on October 19, 2022, the ESOP was purportedly amended once again. ("Fourth Amendment") (*Id.*). The Fourth Amendment amended the ESOP's arbitration clause to permit injunctive relief so long as that relief "does not include or result in the provision of additional benefits or monetary relief to any individual or entity other than" the individual plaintiff. (*Id.* ¶ 101). It clarified that:

> Notwithstanding the foregoing, nothing in this provision shall be construed to preclude a Claimant from seeking injunctive relief, including, for example, seeking an injunction to remove or replace a Plan fiduciary even if such injunctive relief has an incidental impact on an individual or entity other than the Claimant.

(4th Plan Am. § 1, Doc. 44-1 Ex. 5). Based on the Third and Fourth Amendments, Defendants move to compel arbitration of Plaintiffs' lawsuit.

**Legal Standard**

"Arbitration is a matter of contract and of consent." *JPay, Inc. v. Kobel*, 904 F.3d 923, 928 (11th Cir. 2018). "[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *Id.* (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986)). "'The Federal Arbitration Act ("FAA"), Pub. L. No. 68-401, 43 Stat. 883 (1925) (codified as amended at 9 U.S.C. § 1 et seq.), treats contractual agreements to arbitrate 'on an equal footing with other contracts,' and 'imposes certain rules of fundamental importance, including the basic precept that arbitration is a matter of consent, not coercion.'" *Id.* at 928–29 (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) and *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010), respectively). "The FAA 'reflect[s] both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract.'" *Id.* at 929 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). "Where the parties have agreed to arbitrate their dispute, the job of the courts — indeed, the obligation — is to enforce that agreement." *Id.* (citing *Stolt-Nielsen*, 559 U.S. at 682). "At the same time, courts may not require arbitration beyond the scope of the contractual agreement, because 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to

submit.'" *Id.* (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).

## Discussion

## I.      Arbitration of ERISA Claims

ERISA section 502, codified at 29 U.S.C. § 1132,[3] contains ERISA's civil enforcement provision. Under that statute, a participant has three primary bases to bring suit against a Plan:

- Sections 502(a)(1)(A) and 502(a)(2), to compel certain notices and disclosures and penalize failures to notify or disclose;

- Section 502(a)(1)(B), "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan"; and

- Section 502(a)(3), "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132. The third provision, section 502(a)(3), is often referred to as providing a claim for "equitable relief." *Ogden v. Blue Bell Creameries U.S.A., Inc.*, 348 F.3d 1284, 1285 (11th Cir. 2003). Aside from these remedies against the Plan, a

---

[3] References to "sections" refer to sections of the Employee Retirement Income Security Act of 1974, rather than sections of the United States Code, unless otherwise indicated.

participant can bring claims against a fiduciary on behalf of the Plan under sections 502(a)(2) and 409 (29 U.S.C. § 1109).

Plaintiffs' Amended Complaint raises seven counts. Counts I through IV are each section 502(a)(2) claims for breaches of fiduciary or co-fiduciary duty against various Defendants on prohibited transaction and prudence and loyalty theories. These counts seek disgorgement of profits and restitution for losses to the Plan, as well as other appropriate relief. (*See, e.g.*, Doc. 69 ¶ 126). Counts V and VI are section 502(a)(3) claims for equitable relief. These claims seek similar relief to the prior claims on what is effectively a constructive trust theory. Count VII is also a section 502(a)(3) claim for equitable relief seeking to reform the Plan to omit Amendments Three and Four and to rescind the purchase agreement through which the ESOP's shares were sold.

### A.  Framework for Compelling Arbitration of ERISA Claims

"[A]lthough the Eleventh Circuit has not yet ruled directly on the issue, other circuit courts have ruled that ERISA claims are arbitrable." *Louis v. Aetna Health Inc.*, No. 616CV1922ORL22DCI, 2017 WL 6939166, at *3 (M.D. Fla. Jan. 13, 2017) (citing *Williams v. Imhoff*, 203 F.3d 758 (10th Cir. 2000); *Kramer v. Smith Barney*, 80 F.3d 1080 (5th Cir. 1996); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110 (3rd Cir. 1993); *Bird v. Shearson Lehman/Am. Express, Inc.*, 926 F.2d 116 (2nd Cir. 1991); *Arnulfo P. Sulit, Inc. v. Dean Witter Reynolds*, 847 F.2d 475 (8th Cir. 1988)).

As the Ninth Circuit recognized in *Dorman v. Charles Schwab Corp.*, 780 F. App'x 510, 513–14 (9th Cir. 2019), "[c]laims alleging a violation of a federal statute such as ERISA are generally arbitrable absent a 'contrary congressional command,'" which ERISA lacks. *Id.* (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013)).

In this Court's estimation, however, determining whether ERISA includes a "congressional command" against arbitration is only the beginning of the ERISA arbitration analysis. "ERISA is a 'comprehensive and reticulated statute,' and is 'enormously complex and detailed.'" *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999) (internal citations omitted); *see also Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1470 (11th Cir. 1986) ("[ERISA] govern[s] a broad area."). And "ERISA's detailed provisions set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 42 (1987). So, there is not a "one-sized fits all" approach to ERISA arbitration. Instead, courts must scrutinize the nature of the claim at issue as well as the text of the arbitration clause to determine whether the claim is arbitrable under the FAA and relevant Supreme Court precedent. Doing so requires answering a series of questions.

First, based on the type of claim that is being brought (e.g., benefits, fiduciary misconduct, other equitable relief, and so forth), is the claim properly characterized as belonging to a participant or to the plan as a whole? Second, having so characterized the claim, has the proper party manifested its assent to the arbitration clause? Third, are claims by that party within the scope of the arbitration clause? And fourth, does the arbitration clause prevent the effective vindication of the claimant's ERISA rights?

## B.   Characterization of Plaintiffs' Claims

The Court begins with the first question it posed. The most common ERISA claims, claims for benefits under an ERISA plan, are straightforwardly claims belonging to a participant. Because such claims seek to enforce the terms of a plan, ordinary contract principles govern whether the arbitration clause is part of the plan that the participant seeks to enforce. *See Louis v. Aetna Health Inc.*, No. 616CV1922ORL22DCI, 2017 WL 6939166, at *2 (M.D. Fla. Jan. 13, 2017) (enforcing arbitration clause in plan against participant raising a claim for benefits).

As for claims for breach of fiduciary duty under sections 502(a)(2) and 409, courts have held that "ERISA § 502(a)[(2)] claims . . . belong to a plan—not an individual" and therefore "[t]he relevant question is whether the Plan agreed to arbitrate the § 502(a)(2) claims." *Dorman v. Charles Schwab Corp.*, 780 F. App'x 510, 513 (9th Cir. 2019) (citing *Munro v. Univ. of S. Cal.*, 896 F.3d 1088, 1092 (9th Cir.

2018)); *accord Holmes v. Baptist Health S. Fla., Inc.*, No. 21-22986-CIV, 2022 WL 180638, at *4 (S.D. Fla. Jan. 20, 2022).

Claims for equitable relief are less straightforward. In *Varity Corp. v. Howe*, 516 U.S. 489, 514 (1996), the Supreme Court held that ERISA's provision for equitable relief is "enforceable by beneficiaries seeking relief for themselves." So determining whether such relief is sought on behalf of one beneficiary, all beneficiaries, or the plan itself will require looking to the exact relief sought. For example, in *CIGNA Corp. v. Amara*, 563 U.S. 421, 439 (2011), the Supreme Court, in considering whether plan reformation was an available remedy under section 502(a)(3), characterized the suit as follows:

> The case before us concerns a suit by a beneficiary against a plan fiduciary (whom ERISA typically treats as a trustee) about the terms of a plan (which ERISA typically treats as a trust).

*Id.* (citing *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 253, n. 4 (2008); *Varity Corp.*, 516 U.S. at 496–97). As one court noted, a claim for reformation of the plan may require joining all beneficiaries as parties. *DeHoff v. Kan. AFL-CIO Emp. Ben. Plan & Tr.*, No. CIV.A. 11-1052-MLB, 2013 WL 4562840, at *22 (D. Kan. Aug. 28, 2013) ("Plan participants other than Plaintiff are not parties to this action and the court will make no declaration pertaining to their rights . . . . [B]ecause the relief requested could effect [sic] the rights of participants whose interests are not represented here, the court concludes the request to reform the Plan should be

16

denied. See 76 Am.Jur.2d, Trusts § 612 (whether the beneficiaries of a trust are necessary parties may depend on the terms of the trust and the effect of the suit on their equitable interests).”). And determining whether a class consisting of all participants would be bound by an amendment precluding class arbitration may require a determination of whether any or all the class member participants continued to participate in the plan. *Dorman*, 780 F. App’x at 512–13 (“A plan participant agrees to be bound by a provision in the plan document when he participates in the plan while the provision is in effect.”).

Here, as the Court noted above, Plaintiffs’ claims include section 502(a)(2) claims for breaches of fiduciary duty and section 502(a)(3) claims for equitable relief. For the reasons the Court gave above, Plaintiffs’ claims for reformation and rescission are held by participants generally, not by the Plan. So, the Court will need to undertake separate analyses for both sets of claims.

### C.    Whether the ESOP, Participants, or Both Assented

To the extent that the Third Amendment was otherwise validly adopted under the ESOP,[4] the ESOP agreed to arbitration of its potential claims against the

---

[4] The Complaint alleges that the Third Amendment violated the ESOP’s amendment clause, which provided that “no . . . amendment or termination shall be effective which shall attempt to transfer assets of the Plan to purposes other than for the exclusive benefit of Participants and their Beneficiaries, or which shall cause or permit any assets of the Plan to revert to or become the property of the Company prior to the satisfaction of all liabilities of the Plan.” (Doc. 69 ¶ 159). But Plaintiffs do not appear to resist the arbitration clause on this ground.

fiduciary Defendants when the Third Amendment was adopted, which would cover the first set of claims.

As to the claims for rescission and reformation, whether the participants continued to participate is an issue that the Court cannot determine on this record because the Third Amendment terminated the ESOP and Defendants did not provide evidence of Plaintiffs' continued participation after that event. Termination of an ERISA-qualified plan is a singular event with regulatory and tax consequences. *See* 29 U.S.C. §§ 1341, 1344; *see also* 26 U.S.C. §§ 401(k)(10); 409A(b)(3)(B)(iii); 411(a)(4)(G)(ii). But termination of the plan does not "end" its existence. Instead, "[t]he principal effect of plan termination is to prevent participants from earning or accruing benefits after the date of termination and to limit the sponsor's funding obligations to only those benefits that were earned before the plan terminated" with the important caveat that "participants have the right to receive all of the benefits they earned to the date the plan terminated." SNYDER, BENEFITS GUIDE § 4:55 (Sept. 2022 ed.). A terminated plan retains reporting requirements and other winddown obligations until such time the plan assets have been distributed in satisfaction of the plan benefits and there are no longer any participants in the plan. *See* 26 C.F.R. § 1.411(d)-2; 29 C.F.R. Part 4041.

Arguably, any performance by Plaintiffs was complete at termination, and the ESOP became a unilateral, non-executory contract where the only material

performance due was payment of participants' benefits. *See* Rest. 2d. of Contracts § 50(2) ("Acceptance by performance requires that at least part of what the offer requests be performed . . . ."); *cf. In re Spectrum Info. Techs., Inc.*, 193 B.R. 400, 404 (Bankr. E.D.N.Y. 1996) (terminated employee owed no material obligation to employer under employment contract). "[A]rbitration is a matter of consent, not coercion," but a party cannot consent to a contract through conduct that already occurred. *JPay, Inc.*, 904 F.3d at 928–29. That Plaintiffs were never notified of the Third Amendment, through a summary plan description or otherwise, only magnifies the argument that Plaintiffs gave no meaningful assent. (Doc. 81 at 20).

The Court does not hold that an arbitration provision adopted post-termination or at the same time as termination is per se unenforceable as to claims held by participants, but only that the proponent of the arbitration provision must point to some evidence of continued participation aside from the participant's preexisting entitlement to benefits. Defendants had the burden of proving continued participation by Plaintiffs after adoption of the Third Amendment. On page 12 of Defendants' Reply brief, Defendants titled a section: "B. Plaintiffs' Participation In The Plan Constitutes Consent To Arbitrate." (Doc. 84 at 12). But Defendants made no arguments and submitted no evidence to that effect, instead limiting their argument to the issue of the Plan's assent. (*Id.*). The Court has already held that the ESOP assented to the Third Amendment, but that ruling only

applied to claims on behalf of the plan. Thus, the Court will deny the Motion as to Plaintiffs' claims for rescission and reformation.

As to the Fourth Amendment, Plaintiffs gave no assent to their claims for rescission and restitution for the same reasons. But whether the ESOP agreed to the Fourth Amendment for the breach of fiduciary duty claims presents two trickier questions: whether a plan amendment regarding dispute resolution can apply to an existing lawsuit, and under what circumstances may a long-terminated plan whose assets have been completely distributed be amended?

Court have divided on whether a plan amendment governing dispute resolution applies to an existing lawsuit. *Compare Robertson v. Argent Tr. Co.*, No. CV-21-01711-PHX-DWL, 2022 WL 2967710, at *7 (D. Ariz. July 27, 2022) ("Amendment [post-dating complaint] . . . is valid and applies to Plaintiff."), *with Brown ex rel. Henny Penny Corp. Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, No. 3:17-CV-250, 2018 WL 3546186, at *5 (S.D. Ohio July 24, 2018) ("Although plan administrators and employers have broad discretion to modify the terms of a plan, those modifications do not necessarily bind individuals like Plaintiff, who have ceased all participation in the plan and whose cause of action accrued prior to the modification."); *see also Hawkins v. Cintas Corp.*, 32 F.4th 625, 637 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 564 (2023) (declining to reach issue). But the FAA recognizes that an arbitration provision is enforceable regardless of whether it applies to "a

controversy thereafter arising out of such contract or transaction . . . or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract." 9 U.S.C. § 2. Accordingly, determining whether a plan amendment that postdates the complaint applies to the dispute requires answering the same questions posed above—what type of claim is raised, whose assent to the arbitration provision is necessary, and whether such assent was manifested through amendment, participation, or otherwise.[5]

This leads the Court to the harder question: when can a long-terminated plan with no participants[6] and no trust assets adopt an amendment and assent to an arbitration provision?  Plaintiffs allege that "[f]or three years after Amendment

---

[5] That said, the Sixth Circuit recognized the potential for abuse inherent where a sponsor could "unilaterally decide it wants to arbitrate claims against itself. *Hawkins*, 32 F.4th at 637 citing (*Brown ex rel. Henny Penny Corp. Emp. Stock Ownership Plan*, 2018 WL 3546186, at *5  ("Allowing the fiduciary to unilaterally require plan participants to arbitrate claims for breach of fiduciary duty would, in a sense, be allowing the fox to guard the henhouse.")). However, where a plan purports to assent to a post-litem arbitration agreement limited to a specific dispute, for example, a court might scrutinize whether such agreement is a legitimate settlor function "concern[ing] the composition or design of the plan . . . [or] regarding the form or structure of the Plan," or instead a disguised fiduciary action which is itself subject to scrutiny under ERISA. *Hughes Aircraft*, 525 U.S. at 444. In light of the clarifying function played by the Fourth Amendment, and its applicability to all participants generally, the Court does not find those concerns present here.

[6] Under the plan, "[a] Participant ceases to be a Participant when all amounts in his Account have been distributed and/or become Forfeitures." (Jan 1, 2017 Plan at 8, Doc. 44-1 Ex. 1).

Three, the ESOP sat terminated. It had distributed all of its assets, received an IRS determination letter finalizing the termination process, and had no ongoing operations or concerns." (Doc. 69 ¶ 100). But the ESOP still holds at least one asset: legal claims against Defendants. As the Restatement (Third) of Trust explains:

> If a trust is created and subsequently the whole of the trust property ceases to exist, the trust is terminated because the trustee no longer holds anything in trust. If, however, there remains so much as a claim against the trustee or another on behalf of the beneficiaries, the claim constitutes trust property that continues to be held in trust for the beneficiaries.

Rest. 3d. of Trusts § 2 cmt. i (2003); *see also Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000) (quoting *Hughes Aircraft*, 525 U.S. at 447) ("The common law of trusts . . . offers a 'starting point for analysis [of ERISA] . . . [unless] it is inconsistent with the language of the statute, its structure, or its purposes . . .'"). Accordingly, the Court finds that the ESOP still maintained a legal existence such that it could assent to arbitration through the Fourth Amendment.

### D.    Scope of Assent

Courts have rigidly adhered to the distinction between claims brought individually and claims brought on behalf of plans in determining whether an otherwise valid arbitration clause covers a given claim. For example, the Sixth Circuit in *Hawkins* declined to enforce an arbitration clause against claims brought on behalf of the plan where the clause was only binding on the participants in their

capacity as employees. 32 F.4th at 631. However, the clause here applies both to

claims made on behalf of participants and to those made on behalf of the ESOP:

> (a) Covered Claims. Any claim made by or on behalf of a
> current or former Employee, a current or former
> Participant or current or former Beneficiary or by or on
> behalf of the Plan, the Trust or under the Trust
> Agreement (a "Claimant") which arises out of, relates to,
> or concerns this Plan, the Trust Agreement, or the Trust,
> including without limitation, any claim for benefits
> under the Plan, Trust Agreement, or Trust; any claim
> asserting a breach of, or failure to follow, the terms of the
> Plan or Trust Agreement or Trust; and any claim
> asserting a breach of, or failure to follow, any provision
> of ERISA or the Code, including without limitation
> claims for breach of fiduciary duty, ERISA § 510 claims,
> and claims for failure to timely provide notices or
> information required by ERISA or the Code (collectively,
> "Covered Claims"),] . . . .

(3d. Plan Am. at 5, Doc. 44-1 Ex. 4). To the extent that the clause is otherwise valid

and enforceable, it includes all claims alleged here within its scope.

### E.   Whether the Clause Prevents the Effective Vindication of Rights

The Court turns to the final question, whether the clause at issue prevents

the effective vindication of an ERISA right. The Eleventh Circuit has held that

ERISA plans "must be enforced as written unless the plan conflicts with the

policies underlying ERISA or application of the common law is necessary to

effectuate the purposes of ERISA." *Zurich Am. Ins. Co. v. O'Hara*, 604 F.3d 1232,

1236–37 (11th Cir. 2010). As the Court explained above, most courts have found

that ERISA does not contain a per se "congressional command" against

arbitration, and so the mere existence of an arbitration clause does not conflict with the policies underlying ERISA. *Dorman*, 780 F. App'x at 513–14.

Even so, as the Supreme Court has recently clarified, "the FAA does not require courts to enforce contractual waivers of substantive rights and remedies. The FAA's mandate is to enforce '*arbitration agreements*.'" *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 (2022) (quoting *Concepcion*, 563 U.S. at 344). A related line of authority known as the "effective vindication" doctrine permits courts to invalidate, on "public policy" grounds, arbitration agreements that "operat[e] . . . as a prospective waiver of a party's right to pursue statutory remedies." *Italian Colors*, 570 U.S. at 235 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n. 19 (1985)).

Courts have recognized several circumstances where a purported arbitration clause was found to go too far in this respect. First, ERISA itself contains a public policy exception to enforcing certain types of exculpatory agreements:

> Except as provided in sections 1105(b)(1) and 1105(d) of this title, any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy.

29 U.S.C. § 1110(a). Any arbitration clause must be drafted with care so as not to incidentally exculpate a fiduciary. *See Arnold v. Paredes*, No. 3:23-CV-00545, 2024

WL 356751, at *11 (M.D. Tenn. Jan. 31, 2024). That said, "[a]n agreement to conduct arbitration on an individual basis . . . does not [in and of itself] 'relieve a fiduciary from responsibility or liability.'" *Dorman*, 780 F. App'x at 513.

Second, courts have invalidated plans' arbitration provisions based on their "prohibition on certain plan-wide remedies" rather than "plan-wide representation." *Smith v. Bd. of Dirs. of Triad Mfg., Inc.*, 13 F.4th 613, 621–22 (7th Cir. 2021). In *Smith*, as in this case, "the plan's arbitration provision, which also contain[ed] a class action waiver, preclude[d] a participant from seeking or receiving relief that 'has the purpose or effect of providing additional benefits or monetary or other relief to any Eligible Employee, Participant or Beneficiary other than the Claimant.'" *Id.* at 621. The court held that this provision precluded removal of a fiduciary, "a remedy expressly contemplated by § 1109(a)," and therefore invalidated the provision. *Id.*[7]

Finally, where substantive law precludes proceeding on an individual rather than representative basis, an arbitration clause with a class action waiver that precludes relief that impacts other parties in interest might preclude effective vindication of a remedy. One example of an ERISA action requiring such relief for

---

[7] Of course, here, the Fourth Amendment clarified that such relief is available. (4th Plan Am. § 1, Doc. 44-1 Ex. 5). A similar saving clause was found to be sufficient to distinguish *Smith* in *Robertson*. 2022 WL 2967710, at *10. All the same, as the Court holds below, this saving clause does not go far enough to cover the remedies sought here.

effective vindication is a suit alleging a breach of fiduciary duty in a defined benefit plan where participants do not have individual "accounts." In such a case, the Supreme Court has held that a beneficiary has no individual remedy because "the entire text of § 409 persuades us that Congress did not intend that section to authorize any relief except for the plan itself." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142, 144 (1985) ("A fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary").

In contrast, in a defined contribution plan such as the ESOP, ERISA section 502(a)(2) "authorize[s] recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account," allowing for an individual action. *LaRue*, 552 U.S. at 256. This reasoning has led to a circuit split on whether such claims are individually arbitrable.

### i. Circuit Split on Arbitration of Fiduciary Breach Claims in the Defined Contribution Context

First, the Ninth Circuit held in *Dorman* that because "such claims are inherently individualized when brought in the context of a defined contribution plan like that at issue," individual arbitration of a claim against a fiduciary of a defined contribution plan is therefore permissible. 780 F. App'x at 514.

Since *Dorman*, two courts of appeals have reached the opposite conclusion under the effective vindication doctrine. The Sixth Circuit held that a materially similar arbitration provision to the one here "would clearly prevent [the claimant] from obtaining at least some of the forms of relief that he seeks in his complaint pursuant to § 1132(a)(2), including . . . the imposition of liability . . . for losses suffered by the Plan generally." *Harrison v. Envision Mgmt. Holding, Inc. Bd. of Dirs.*, 59 F.4th 1090, 1106–07 (10th Cir. 2023), *cert. denied sub nom. Argent Tr. Co. v. Harrison*, 144 S. Ct. 280 (2023). Similarly, the Third Circuit wrote that a materially similar clause to the one in the ESOP here "prohibit[ed] ESOP participants from bringing a lawsuit that 'seek[s] or receive[s] any remedy which has the purpose or effect of providing additional benefits or monetary or other relief' to any third party . . . [b]ut § 1109(a) expressly allows ERISA plan participants to seek such relief." *Henry ex rel. BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v. Wilmington Tr. NA*, 72 F.4th 499, 507 (3d Cir.), *cert. denied*, 144 S. Ct. 328 (2023). The court specifically identified "the clause of § 1109(a) that authorizes a plan member to seek restitution of plan losses from a fiduciary" because "[t]hat provision does not limit restitution to the plaintiff's losses: it "permit[s] recovery of all plan losses caused by a fiduciary breach." *Id.* (quoting *LaRue*, 552 U.S. at 261 (Thomas, J., concurring)). "Because the class action waiver purports to prohibit statutorily

authorized remedies," it wrote, "the class action waiver and the statute cannot be reconciled." *Id.*

### ii.  The Supreme Court's Decision in *Viking River*

Both parties point to *Viking River* to support their preferred resolution of the circuit split. That case involved the Labor Code Private Attorneys General Act (PAGA) which was enacted "to address a perceived deficit in the enforcement of the State's Labor Code." 596 U.S. at 643. "By its terms, PAGA authorizes any 'aggrieved employee' to initiate an action against a former employer 'on behalf of himself or herself and other current or former employees' to obtain civil penalties that previously could have been recovered only by the State in a[] [government] enforcement action." *Id.* at 644. "In any successful PAGA action, the [government] is entitled to 75 percent of the award . . . [and] [t]he remaining 25 percent is distributed among the employees affected by the violations at issue." *Id.*

Under California law, "the State 'is always the real party in interest in the suit' . . . . In other words, the statute gives employees a right to assert the State's claims for civil penalties on a representative basis, but it does not create any private rights or private claims for relief." *Id.* at 645–46 (citations omitted). But the Court noted that "California precedent also interprets the statute to contain what is effectively a rule of claim joinder. . . . [because] [a]n employee with statutory standing may 'seek any civil penalties the state can, including penalties for

violations involving employees other than the PAGA litigant herself.'" *Id.* at 646–47 (citation omitted). Based on an arbitration provision in the parties' employment agreement, the defendant moved to compel arbitration of the plaintiff's "'individual' PAGA claim . . . meaning the claim that arose from the violation she suffered . . . and to dismiss her other PAGA claims." *Id.* at 648. The California courts denied the motion "holding that categorical waivers of PAGA standing are contrary to state policy and that PAGA claims cannot be split into arbitrable individual claims and nonarbitrable 'representative' claims." *Id.*

The Supreme Court reversed, holding that California's "prohibition on contractual division of PAGA actions into constituent claims unduly circumscribes the freedom of parties to determine 'the issues subject to arbitration' and 'the rules by which they will arbitrate,' and does so in a way that violates the fundamental principle that 'arbitration is a matter of consent.'" *Id.* at 659 (quoting *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) and *Stolt-Nielsen*, 559 U.S. at 684, respectively). But in reaching that question, the Court noted "important structural differences between PAGA actions and class actions that preclude any straightforward application of our precedents invalidating prohibitions on class-action waivers." *Id.* at 654. Like a class action, "PAGA actions also permit the adjudication of multiple claims in a single suit, but their structure is entirely different," because "[a] class-action plaintiff can raise a multitude of claims

29

because he or she represents a multitude of absent individuals; a PAGA plaintiff, by contrast, represents a single principal, the [government entity], that has a multitude of claims." *Id.* at 655. "As a result of this structural difference," the Court wrote, "PAGA suits exhibit virtually none of the procedural characteristics of class actions," including the need for certification, because "PAGA judgments are binding only with respect to the State's claims, and are not binding on nonparty employees as to any individually held claims." *Id.* (citations omitted). "And although the statute gives other affected employees a future interest in the penalties awarded in an action, that interest does not make those employees 'parties' in any of the senses in which absent class members are . . . or give those employees anything more than an inchoate interest in litigation proceeds." *Id.* (citations omitted). Critically, the Court acknowledged that "[n]othing in the FAA establishes a categorical rule mandating enforcement of waivers of standing to assert claims on behalf of absent principals" which are "part of the basic architecture of much of substantive law." *Id.* at 656–57 (identifying "shareholder-derivative suits, wrongful-death actions, trustee actions, and suits on behalf of infants or incompetent persons" as examples).

But though the Court found inapt existing caselaw precluding compelling class arbitration without the parties' consent, it still found the FAA preempted the California courts' rule of PACA claim joinder, noting that the effect of "mandating

this mechanism is to coerce parties into withholding PAGA claims from arbitration," writing further:

> Liberal rules of claim joinder presuppose a backdrop in which litigants assert their own claims and those of a limited class of other parties who are usually connected with the plaintiff by virtue of a distinctive legal relationship—such as that between shareholders and a corporation or between a parent and a minor child. PAGA departs from that norm by granting the power to enforce a subset of California public law to every employee in the State. This combination of standing to act on behalf of a sovereign and mandatory freeform joinder allows plaintiffs to unite a massive number of claims in a single-package suit.

*Id.* at 661.

### iii.   Application of *Viking River* to this Case

Plaintiffs assert that *Viking River* supports the proposition that arbitration clauses cannot preclude plan wide relief against fiduciaries. They argue that actions by a participant on behalf of the plan are representative actions that are "part of the basic architecture" of ERISA and constitute substantive law, not a procedural joinder device. (Doc. 81 at 14) (citing *Viking River*, 142 S. Ct. at 1922). They write:

> The key point Defendants miss is that a participant's right to pursue remedies that bind the plan administrator and redress injury to the plan is not the same as class-action or claim joinder procedures that "unite a massive number of claims in a single-package suit." *Viking Rive*r, 142 S. Ct. at 1924. The cases in which courts have awarded plan-wide relief to individual plaintiffs, *see*

31

*supra* at 9 & n.4, confirm this critical point: § 1109 is not a mere procedural mechanism for combining multiple individual claims into one action. A single plaintiff can obtain full plan-wide relief because the plaintiff is acting on behalf of the plan itself. *See, e.g.*, *Viking River*, 142 S. Ct. at 1922–24.

(*Id.* at 17).

In response, Defendants write "Plaintiffs' invocation of the Supreme Court's decision in *Viking River* . . . is inapposite because Plaintiffs rely on the part of the decision that is irrelevant while ignoring the part that is on point." (Doc. 84 at 9). Defendants assert that in *Viking River*, "the arbitration provision—specifically, its prohibition on bringing a 'representative' PAGA claim in arbitration—was unenforceable with respect to the first form of PAGA claim, but the provision was enforceable with respect to the second, 'claim joinder' form of PAGA claim." (*Id.*) (citing *Viking River*, 142 S. Ct. at 1922–24). And, they argue, "[a] representative claim under ERISA § 502(a)(2) is a form of 'claim joinder'" because "each participant has an individual § 502(a)(2) claim with respect to his or her individual account, and one participant seeks to join those claims together in a class or collective action only after satisfying procedural requirements similar to Rule 23 for class actions." (*Id.* at 9–10).

As with many other aspects of ERISA, the Court thinks that the answer is not straightforward and depends on the facts of the case. While the Court agrees that *LaRue* stands for the prospect that an individual participant in a defined

contribution plan *may* bring suit under ERISA section 502(a)(2) for fiduciary breaches that impair the value of plan assets in a participant's individual account, it does not follow that an individual participant in such a plan may *only* bring suit for breaches that impair the value of plan assets in a participant's individual account rather than breaches that endanger the plan as a whole. 552 U.S. at 256. As Justice Thomas cogently explained in his *LaRue* concurrence:

> [t]he allocation of a plan's assets to individual accounts for bookkeeping purposes does not change the fact that all the assets in the plan remain plan assets. A defined contribution plan is not merely a collection of unrelated accounts. Rather, ERISA requires a plan's combined assets to be held in trust and legally owned by the plan trustees. See 29 U.S.C. § 1103(a) (providing that "all assets of an employee benefit plan shall be held in trust by one or more trustees"). In short, the assets of a defined contribution plan under ERISA constitute, at the very least, the sum of all the assets allocated for bookkeeping purposes to the participants' individual accounts. Because a defined contribution plan is essentially the sum of its parts, losses attributable to the account of an individual participant are necessarily "losses to the plan" for purposes of § 409(a).

552 U.S. at 262–63 (Thomas, J., concurring).

Additionally, like in the ESOP here, trusts established by defined contribution plans are typically responsible for payment of the expenses of administration of the plan and the trust, and mismanagement of the trust therefore

threatens the solvency of the plan. (*E.g.*, Jan. 1, 2017 Plan at 26, Doc. 44-1).[8] For this reason, a pro-rata disgorgement paid to a participant's account may not accomplish the goal of ensuring the plan has the funds to operate in excess of benefits owed, and in such a case, disgorgement as well as removal of a fiduciary may be necessary. By adopting the Fourth Amendment, Defendants effectively conceded that barring certain plan-wide relief such as removing a fiduciary would be problematic. But it is internally inconsistent to say, on the one hand that fiduciary breaches in defined contribution plans inherently cause individual injuries and on the other concede that some plan-wide remedies are available (such as injunctive relief) but not others (such as disgorgement).

For this reason, returning to *Viking River*, the Court finds that under the particular facts here, where the alleged injury is a single transaction that ostensibly harmed the assets of the plan collectively, rather than individual decisions that may have affected one or more participants based on their own particular holdings, a participant bringing a fiduciary breach claim acts in a role more akin to the representative of a single principal resolving a single claim than as the lead

---

[8] In fairness, the Court notes that the Third Amendment obligated the Company to pay such expenses after the closing of the September 2019 transaction. (3d. Am. at 3, Doc. 44-1 Ex. 4). All the same, this does not change the fact that in general, participants of a defined contribution account have an interest in the administration of the plan writ-large separate from the interest in their account balance.

plaintiff in a package of claims joined together. *Cf. Viking River*, 596 U.S. at 661 ("[T]he joinder rule internal to PAGA functions in exactly this way. Under that rule, parties cannot agree to restrict the scope of an arbitration to disputes arising out of a particular 'transaction' or 'common nucleus of facts.'"). This is so regardless of whether the plan is defined contribution or defined benefit. *LaRue*, 552 U.S. at 261 (Thomas, J., concurring) ("Although I agree with the majority's holding, I write separately because my reading of §§ 409 and 502(a)(2) is not contingent on trends in the pension plan market.").

Because there appears to be no reasonable dispute that the arbitration provision here is largely identical to the ones struck down in *Harrison* and *Henry*,[9] and because the Court finds that application of those decisions to this case would not run afoul of *Viking River*, the Court holds that the arbitration clause in the Third and Fourth Amendments is invalid under the effective vindication doctrine for the reasons given in those cases. 59 F.4th at 1090; 72 F.4th at 499.[10] And because the

---

[9] Defendants write, "Plaintiffs also claim that the arbitration clauses in *Harrison*, *Henry*, and *Smith* are the same as the arbitration clause in this case and thus the holdings in those cases should apply . . . Plaintiffs however fail to include the key language that distinguishes the arbitration provision in the A360 Plan from the arbitration provisions in those other cases that makes clear that injunctive relief, including plan-wide injunctive relief, is not barred. . . ." (Doc. 84 at 8). For the reasons the Court gave above, the Court does not find this language sufficient to distinguish the clause at issue from the ones at issue in those cases.

[10] Defendants assert that because the Department of Labor is able to bring an enforcement action for plan-wide remedies, the arbitration clause here does not

arbitration provision is by its own terms not severable, the Court invalidates it in full.[11] The Court thus need not reach whether the fee shifting provision in the Third Amendment is enforceable.

## Conclusion

For the above reasons, Defendants' Motion to Compel Arbitration (Docs. 44) and Renewed Motion to Compel Arbitration (Doc. 78) are **DENIED**. It is

**FURTHER ORDERED** that Defendants' Motion for Oral Argument (Doc. 85) is **DENIED AS MOOT**. It is

**FURTHER ORDERED** that Defendants are **DIRECTED** to file an answer or other response to the Amended Complaint within 45 days of the date of entry of this Order. The Parties are **FURTHER DIRECTED** to file a Joint Preliminary

---

prevent effective vindication of ERISA, but the Tenth Circuit rejected this argument in *Harrison:* "Regardless of who brings suit under § 1132(a)(2), however, the fact remains, as the Supreme Court has made clear, that the suit is 'on behalf of [the] plan' itself, and the precise same statutory remedies are available regardless of the named plaintiff." 59 F.4th at 1112 (quoting *LaRue*, 552 U.S. at 253).

[11] The Court has held that the Third and Fourth Amendments do not bind the Plaintiffs as to their claims for rescission and reformation, but would also hold that those Amendments preclude effective vindication of such remedies, because such remedies necessarily affect all participants, entitling them at the very least to notice of and opportunity to respond to the appropriateness of the remedy. Defendants provide no citation for their argument that "reformation of the Plan document as to" one participant only is an available remedy under ERISA's equitable relief provision. (Doc. 84 at 11).

Report and Discovery Plan under Local Rule 16.2, 30 days after the date of the first-filed answer or other response.

  **SO ORDERED** this 20th day of March, 2024.

Victoria Marie Calvert
United States District Judge